Nellie V. Cook, Respondent, v. St. Joseph Railway, Light, Heat & Power Company.—106 S. W. (2d) 38.

Kansas City Court of Appeals. April 5, 1937.

314

*Schultz & Owen* for respondent.

*Mayer, Conkling & Sprague* for appellant.

SHAIN, P. J.—In this action the plaintiff seeks to recover from defendant damages for the death of her husband.

It stands admitted that defendant is a corporation and that it operates an interurban street car over its tracks between the City of

St. Joseph and Savannah, Missouri. The accident involved happened in or near the town of Industrial City in Buchanan County, Missouri, and at a place where there was a custom of user by pedestrians on the defendant's railroad tracks.

In plaintiff's petition it is alleged that:

"On the 28th day of June, 1935, about 11:00 o'clock P. M. in the nighttime deceased was lying between the rails of said track in front of his said home and in a place of danger and imminent peril of being struck by one of defendant's interurban cars at the point where the track is located in front of deceased's home as aforesaid and deceased was oblivious to said peril and danger and that defendant and its employee in charge of said cars saw and knew, or, by the exercise of ordinary care, considering said user of said track as aforesaid and considering deceased's position on said track as aforesaid, could and should have seen and known of said peril and danger and that deceased was oblivious to the same in time thereafter by the exercise of ordinary care through the use of the means and appliances at hand without jeopardizing the safety of himself or others could have stopped said car before it struck and ran over deceased and killed him, but negligently failed to do so, and that by reason of said failure and negligence deceased was struck and run over by said interurban car and killed; that by reason of said negligence, plaintiff is entitled to a forfeiture and penalty in a sum not less than $2,000.00 and not to exceed $10,000.00."

Issue was joined by defendant filing a general denial and further answered as follows:

"Further answering said petition, defendant states the facts to be that at the time and place alleged in plaintiff's petition, Arthur B. Cook, the husband of plaintiff, had been and had become intoxicated, and that in such state of intoxication and while under the influence of intoxicating liquors, the said Arthur B. Cook negligently lay down upon the interurban track, that he negligently remained lying upon said interurban track in a drunken and insensible stupor, and that he negligently so remained upon said track without looking or listening for approaching interurban cars, when by looking he could have seen or by listening he could have heard said interurban car, in time to have gotten off of said track and to have avoided being struck by said interurban car; that each and every act of negligence above set out caused and contributed to cause the injuries and death of the said Arthur B. Cook."

Trial was by jury and jury returned verdict for plaintiff in the sum of $3,500. Judgment was had and entered in accordance with the jury verdict and defendant appealed.

Assignments of error as follows:

"I.

The court erred in admitting in evidence the results of experiments made subsequent to the accident regarding the visibility from the vestibule of an interurban car of a man's body lying between the rails in the roadbed at the place where deceased was run over.

"II.

"The court erred in refusing the instructions in the nature of demurrers offered by the defendant at the close of all the evidence.

"III.

"The court erred in making in the presence and hearing of the jury improper comments on the evidence and erroneous declarations as to the law, to defendant's prejudice.

"IV.

"The court erred in giving plaintiff instruction No. 1."

We will continue to refer to the parties, appellant as plaintiff and respondent as defendant.

OPINION.

It is shown by the evidence that the motor car in question on the night of the accident was traveling in a southwesterly direction and that for a distance of three hundred feet back from where the accident happened there was a straight track and that the motor car was equipped with a good headlight that projected its rays of light for a distance of three hundred feet ahead.

It is admitted, that the deceased was drunk and shown, "that deceased was lying flat on his back with his head turned on his right arm with his head to the south and that he had on a gray shirt and a pair of faded blue overalls." It is further shown that he was laying in this position between the rails of defendant's track.

The only eye-witness to the accident was W. R. Pinch, the motorman on said motor car at the time of the accident, 11:10 P. M. June 28, 1935.

The plaintiff called W. R. Pinch, aforesaid, as a witness and we set forth herein sufficient of his testimony to give a comprehensive understanding of the sum and substance of same.

On direct examination of Mr. Pinch the following appears:

"Q. Assuming Mr. Pinch that you understood that a man was lying on the track in front of Mr. Cook's house, state at what distance you could have discovered him or seen him? A. I could not have seen him any sooner than I did.

"Q. Sixteen feet? A. Sixteen feet.

"Q. Was there anything, any growth of any kind in the roadbed at that point where Mr. Cook was lying? A. Do you mean weeds?

"Q. Anything growing? A. Yes, sir, there was weeds in the track.

"Q. How many? A. Well, there was quite a few.

"Q. Was the roadbed covered with weeds? A. Yes, sir.

"Q. What effect, if any, did the weeds in the track have as to your ability to discover the body before you did? A. Well, he was laying down in the weeds and they were up about the height of his body, just kinda hid him.

"Q. Read the question (question read by the reporter). A. Well, they just hid him. They were up as high as his body.

"Q. You mean it prevented you from seeing him? A. Yes, sir.

"Q. Suppose that there had been no weeds there in the roadbed at that point, state whether or not you could have seen him any sooner than you did. A. Well, the color of his clothing kinda blended with the ground and the surroundings and it would have been impossible to have seen him any sooner.

"Q. Even though there were no weeds? A. Yes, sir."

On cross-examination, the following:

"Q. On this night as you were operating your car south from the— you know where Vey's is? A. Yes.

"Q. Is Vey's the curve just to the north of where you say Mr. Cook's house is? A. Yes, sir.

"Q. The curve in the track and the highway both? A. Yes, sir.

"Q. As you were coming down from Vey's up there, were you looking out ahead of your interurban car? A. Yes, sir.

"Q. Did you ever move your eyes from looking down the track in front of your interurban car? A. No, sir.

"Q. State if you were on the lookout, not only for people approaching your track but people, or things, on the track, as well? Were you on the lookout for things on the track? A. Anything that was on the track, yes, sir.

"Q. When you were up at Vey's or coming down from Vey's coming down towards Mr. Cook's home from Vey's, and when you got within say 300 feet of where Mr. Cook's body lay, could you distinguish his body lying on the track there? A. Not until I got within 16 feet of it, no sir.

"Q. I said when you were 300 feet away, could you distinguish it? A. No, sir.

"Q. Tell the jury why you could not distinguish it? A. Well, the position he was laying in in the weeds, and the clothing he had on blended with the ground and the weeds, and it was impossible to see him any sooner than I did. As I said before, if it had been my own mother, I could not have seen her.

"MR. SHULTZ: We object to his talking about his mother as having nothing to do with the case.

"THE COURT: Sustained.

"Q. Was there any distinguishing mark about his body, or on his clothing, which made him stand out in relief as against the rest of the color, or the terrain there between the tracks where he lay? A. No, sir.

"Q. And were you looking right ahead all of the time? A. All of the time, yes, sir.

"Q. When you were 300 feet away, was there anything at all to distinguish, to make his body stand out? A. No, sir.

"Q. As you approached a point closer than 300 feet, and moved from a point 300 feet away, up toward his body, were you looking all of the time then? A. Yes, sir.

"Q. Were you able then at all to distinguish his body from anything else that was there? A. No, sir.

"Q. Tell the jury why you could not? A. Well, from where it was in the weeds, laying in the weeds, he didn't move and didn't make any motion at all. I just could not see him any sooner than I did. It could not be done.

"Q. If he had been walking could you have seen him? A. Yes, sir.

"Q. If he had been sitting down, could you have seen him? A. Yes, sir.

"Q. If he had been up on his elbow, could you have seen him? A. Probably could, yes, sir.

"Q. Had it been reported to you that a man was lying there on the track? A. No.

"Q. Did you have any idea that anyone was lying there? A. No, sir.

"Q. Were you looking at all times to be sure there wasn't anyone on the track? A. Yes, sir.

"MR. SHULTZ: Do you mean lying?

"Q. Lying on the track when you were operating your car? Were you undertaking as well to determine if there was anything down on the track as well as up on the track? A. Yes, sir.

"Q. Did you see Mr. Cook's body there on the track? That is, just as quickly as it was possible for you to have seen it? A. I absolutely did.

"Q. And when you saw his body there on the track and could distinguish it, as a body, or as something, from the surroundings, tell the jury what you did? A. Just the instant I seen him I set my car in emergency.

"Q. By that you mean what, with regard to the brake, if anything? What did you do about the brake? A. I set the car in emergency and that applies the brake, the sand, and cuts out the power all at the same time.

"Q. Did you have your power on when you first came up and could distinguish his body? A. No, sir.

"Q. You did not have it on? A. No, sir.

"Q. Did you have any air at all in the air cylinders, or brake, or brake cylinders? A. No, sir.

"Q. From the time you first saw him and first could distinguish that there was something there and that it was necessary for you to

make an emergency stop, just as quickly as you could, did you after that time, stop the car in the shortest space of time possible, under the circumstances? A. Yes, sir, I did.

"Q. Did you leave anything undone, I mean, did you fail to do anything which would have sooner stopped your car? A. No, sir.

"Q. Was it possible at all for you to stop in the distance that you had between you and him, after you could distinguish his body? A. No, sir, I could not have stopped at all at that distance any sooner than I did stop.

"Q. What? A. I could not have stopped any sooner than I did stop.

"Q. Going into emergency—what kind of an operation is it, what do you do to put the brake on? A. It is handled with your right hand.

"Q. What do you do? A. Put it in emergency.

"Q. What do you do? A. Swing it over.

"Q. Clear to the right as far as it will go? A. Yes, sir.

"Q. Did you do that instantly? A. Yes, sir.

"Q. Was your car in good condition that night? A. Yes, sir.

"Q. Anything at all wrong with it? A. No, sir.

"Q. Now, with regard to the condition, the situation in which he was lying there, do I understand you to tell the jury that he was down under the weeds? A. No, he was not under the weeds.

"Q. What do you mean? A. Well, the weeds were up about his body and he just lay down there and the weeds all around him like that (indicating).

"Q. There were no weeds up between you and him hiding his body from you? A. No, sir, there wasn't any weeds up like that.

"Q. I mean weeds up between you and him hiding his body from you? A. No, sir, there wasn't any weeds up like that.

"Q. There wasn't any weeds in which he could get down and submerge himself? A. No.

"Q. Was his clothing the same color as the surrounding weeds and the place there between the track? A. Yes, sir, it just looked like it was all ground and weeds.

"Q. And were you looking at it every instant of the time you were approaching that place? A. Yes, sir, absolutely.

"Q. Mr. Shultz asked you some questions about if you had known that he was lying there. If it had been reported to you he was there, or a man was lying down there on the track or anything on the track, so far as that is concerned, if you had known it, what would you have done when the knowledge came to you?

"Mr. Shultz: That has been gone over, once, at least, if not more times.

"Q. You asked it.

"THE COURT: I don't recall that he has asked it as to what he could have done.

"Q. If you had known it, Mr. Shultz says, up about Vey's or any place there, if there had been a man on the track, what would you have done? A. If someone had reported to me there was a man lying on the track up at Vey's I would have stopped up there.

"Q. Or anything else, if they had reported it, what would you have done? A. I would have stopped at Vey's and taken my light and went down and found him and got him off the track.

"Q. From the spot where the front of your car was when you put your brake lever over into emergency, until your car stopped, how many feet did it run? A. Ninety-two feet to the back end of my car.

"Q. The front end ran the distance of the car as well? A. That is 142 feet. The car is 50 feet long. From where the body lay after it was run over to the rear end of the interurban was 76 feet, the length of the interurban is 50 feet and that is 126 feet and the 16 feet distance that I seen him before where I applied my air until I stopped, would make 142 feet to the head end of the car from where I first seen him.

"Q. Then the front of the car from the place where you put the brake on to the place where the front of the car came to a stop moved how many feet? A. One hundred forty-two.

"Q. Could you have stopped your car in any less distance than you did stop it on that occasion under the circumstances existing there that night? A. No, sir.

"Q. I understood you to say the ray of your headlight hit on to the rails about 300 feet in front of you? A. Yes, sir.

"Q. And by an adjustment you, or other motormen, can tilt, or lift up the headlight, so that the ray will strike farther ahead or closer to your car? A. Yes.

"Q. And had you adjusted the headlight any at all since you left Savannah? A. No, sir.

"Q. Why was it you had it adjusted to hit the rail 300 feet ahead of you instead of say 100 feet in front? A. Well, in running an interurban car it runs so that at a space of 100 feet, if I put on the brake, in 100 feet you could not see it in time to stop, running at the speed they run.

"Q. You mean your speed between Savannah and St. Joseph is such that you have to have further vision with the ray of light on your car? A. Yes, sir."

It is shown that at 11:00 P. M., June 28, 1935, there was no moon shining but that it was a clear night.

For reasons that hereinafter appear, we here note that we have carefully examined the record as to all the testimony given by wit-

ness Pinch and there is shown no equivocation or contradiction and as against his credibility no contradictory statements by him are offered or shown.

In the trial there were introduced a number of photographs of the scene of the accident. Those taken and produced by plaintiff were taken but shortly after the accident and corroborate the witness Pinch as to grass and weeds. Those taken by defendant were taken much later than the ones presented by plaintiff and are not so distinct as to grass and weeds. We have learned that photography has its tricks, still the parties introduced them in evidence, and we conclude that the exhibits as offered tend to corroborate witness Pinch as to grass and weeds.

With the purport of the testimony of plaintiff's witness Pinch in mind, we give consideration to defendant's assignment of error No. 1.

The plaintiff called six witnesses who are shown to have, under the direction of plaintiff, boarded the interurban car and in the vestibule thereof observe as the car approached from a position three hundred feet from the scene of the accident.

This testimony is designated by plaintiff in her brief as experiments made in 1936 on June 6th, 8th and 13th, at 9:30 P. M.

It appears that these witnesses, after an examination of the track and place of accident, boarded the interurban car and placed themselves in a place of lookout in the vestibule and made observations as the car proceeded down the track toward the scene of where the accident had occurred nearly a year before. Strenuous objections were made to the testimony of those witnesses and exceptions duly saved.

During the examination of these witnesses much controversy occurred by reason of objections made. Wiping aside matter of preliminary skirmish, the questions objected to resolved down to practically the following:

"Q. State to the jury what distance you could see on that night standing in the vestibule with the light of the headlight to guide you, state in what distance you could see a body lying between the rails of the roadbed, the size of a man, at the spot in front of Mr. Cook's house—at what distance you could see that object before the interurban reached that spot? How far back, in other words, the interurban was north of the spot where the object the size of a man lay in front of Mr. Cook's house, that you could see that object."

The numerous objections made to the above class of questions are in substance, that the evidence was not based upon experiments wherein *causal* conditions and circumstances were substantially reproduced. These objections were overruled and exceptions saved.

We conclude that we are not justified, in the light of the fact that defendant's objections are directed only to the questions asked, in

holding that the court committed error in permitting these witnesses to testify. However, it is within our province, in the consideration of the demurrer, to determine as to admissibility as to any of such testimony directly objected to and exception saved and also as to whether or not the testimony given by these witnesses has any probative value upon any issue in this case, or as to whether contradictory of witness Pinch.

Defendant's assignment No. II is that the court erred in refusing the instruction in nature of a demurrer at the close of the evidence. We, of course, must consider all of the evidence in its most favorable light to plaintiff.

In giving consideration to the above, we do so in connection with the opinion of this court in Frye v. St. Joseph Ry., Light, Heat & Power Co., 99 S. W. (2d) 540.

It will be noted that the same party defendant appears in the Frye case as in this.

The accident in this case occurred north of the center of Industrial City at 11:10 P. M., June 28, 1935.

The accident in the Frye case occurred South of the center of Industrial City at 12:30 P. M. June 28, 1935.

The deceased in each case was run over and killed by an interurban car of defendant.

Deceased in the Frye case was lying on the track face down across the rail. The deceased in this case was lying on his face and between the rails. It was clear when the accident occurred in the case at bar. When the accident in the Frye case occurred, one hour and twenty minutes later, it was raining.

The headlights of the cars in each case were standard and projected lights at like distances. In the Frye case defendant saw the deceased twenty feet ahead and in this case sixteen feet.

Other coincident facts are, that the same medicine show was operating in Industrial City and the same soft drink parlors doing business in said city and, in the Frye case, the stupefying influence of drinks soft or otherwise was a disputed question, in the case at bar an established and admitted fact.

In the Frye case, as in this, the only eye-witness was the motorman and in the Frye case, as in this, testimony as to observations made after the accident was presented. In each case the plaintiff used the motorman as a witness.

Having set forth wherein there is great similarity, we now set forth some characteristic differences between the Frye case and the case at bar.

In the Frye case the plaintiff had taken the deposition of the defendant's motorman and when plaintiff placed him upon the stand his testimony varied from that in the deposition and plaintiff claimed

surprise and was permitted to cross examine him at length and the evidence of the witness presented some contradiction as to grass and weeds obstructing the view.

The observation testimony in the Frye case was directed to only the general outlook with conditions and lights considered, while in the case at bar the witnesses are called upon to invade the province of the jury and give the witnesses' conclusion that he could have seen something that was not there for him to see.

In the Frye case it is stated by us that the observation testimony was but of little probative value, but was not prejudicial for the reason that the motorman's testimony as to visibility showed greater visibility than did the observers' testimony.

The humanitarian rule as applied in Missouri is one of the most liberal in the United States and in the Frye case we went to the brink of the limit in giving application. The judgment in the Frye case was sustained by us upon the testimony of the motorman alone and then only upon the theory based upon an exception to the rule that one who calls a witness is bound by his testimony. In the Frye case the motorman, the employee of the defendant, though called by the plaintiff had so contradicted as to the presence of obstructing vegetation, that the jury was entitled to disregard same and that, based upon the testimony of the motorman concerning visibility four or five hundred feet ahead, the jury were justified to infer that the man up over the rail could have been seen in time to have avoided the accident.

In the case at bar the motorman, when called as a witness for the plaintiff, in no point quibbles or contradicts himself. In a straight forward way the witness tells what happened and gives facts, circumstances and conditions that prevented him from discovering the deceased in time to avoid the accident.

If a party puts a witness on to prove his case and the testimony of said witness is the only evidence adduced concerning the matter in question, then the party calling the witness becomes bound by his testimony. [Schroer v. Brooks, 224 S. W. 53, 204 Mo. App. 567.]

When a party to a suit calls even his adversary as a witness he is absolutely bound by his testimony except to the extent that the contrary is shown by other evidence. [Spencer v. Anderson, 229 S. W. 226.]

The rule as to placing an adverse witness on the stand, as in the Frye case, supra, is that the party introducing such witness is not bound by the testimony most unfavorable to him, but the jury may believe the favorable testimony given by such witness or may wholly reject the whole of said witness's testimony. [Kierns v. Gibson, 289 S. W. 358.]

There is nothing shown in the record in this case that would justify us to conclude that the witness, W. R. Pinch, motorman aforesaid,

was an adverse witness and there does not appear in the record or briefs herein that plaintiff makes claim that said witness was adverse and we only discuss here to distinguish from the situation in the Frye case, supra.

In considering the question of demurrer, we must give consideration of what plaintiff designates as experiments.

We conclude that it was proper for the plaintiff to have persons examine as to the defendant's tracks and as to the general conditions approaching to and at the scene of accident and to examine as to the lights on the car and to board the car and observe as to conditions of visibility, and we further conclude, that it was perfectly proper for the plaintiff to place these witnesses on the stand and have them to testify as to the facts as observed. Such presents proper evidence for the jury and the fact that said observations were made approximately a year later and at an hour different but goes to the weight of such testimony. We have carefully examined the testimony of plaintiff's witnesses of and concerning the facts as to the conditions testified to, as facts based upon their observations. The observations made are shown to have been at much earlier date in the month than the date of the accident and at a time one hour and forty minutes earlier in the night and on June 6th the moon was above the horizon.

An examination of the facts testified to by these witnesses causes us to conclude that at no material point does this testimony impeach the testimony of plaintiff's witness Pinch or in any way relieve plaintiff from being bound by the evidence given by witness Pinch.

As to the testimony of these witnesses elicited by questions of the nature of the one set out above, wherein, on some theory of experiment the witnesses were permitted to give their conclusions as to the exact question that was in issue, we conclude that said testimony was erroneously admitted and that same cannot be considered of any probative value in our review as to the question of demurrer.

In order for experimental evidence to be admissible the conditions under which the experiment is made should conform to the conditions existing at the time and place of the accident. In other words, the conditions and circumstances must be substantially reproduced. [Lynch v. M. K. T. Railroad Co., 333 Mo. 89.]

In Riggs v. Metropolitan Street Railway Co., 216 Mo. 304, l. c. 327, it is said:

"We find no fault with plaintiff's position of law, viz.: that experiments and their results are admissible proof when it is first shown that causal conditions and circumstances are substantially reproduced at the experiments. That view they maintain by an array of authority cited in their brief (q. v.). The true rule seems well put in 17 Cyc. 285, viz.: 'The conditions of a relevant occurrence may be artificially created in an experiment. Where the material facts bearing on a

particular issue are precisely duplicated in the experiment the result may be received in evidence, the burden being on the proponent to show the correspondence in essentials.' "

The fact is that the aforesaid testimony is in no wise based upon any experiment. Witnesses who have gone to the scene practically a year later and made observations at 9:30 on a fine June night have been permitted to invade the province of a jury by giving their conclusions of and concerning the very fact in issue.

We conclude that, under the facts and circumstances shown in the record herein, the plaintiff is bound by the uncontradicted facts as testified to by plaintiff's witness Pinch and as said witness testifies he did not and could not see the deceased in time to avoid the accident and further gives reasons therefor that have not been refuted by any probative evidence, we conclude that the court committed error in refusing defendant's demurrer. There should have been a directed verdict for defendant.

Judgment reversed and cause remanded with instruction to the trial court to give and enter judgment for defendant. All concur.