W. H. RICHESON, Administrator of The
Estate of Howard Lee Richeson,
Deceased, Respondent,

v.

Donald Earl HUNZIKER, Appellant.

No. 47418.

Supreme Court of Missouri,

Division No. 2.

Sept. 11, 1961.

Errol Joyce, Robert Devoy, Brookfield, Harry P. Thomson, Jr., Kansas City, for appellant.

James J. Wheeler, Keytesville, Edwards, Hess & Collins, Macon, for respondent.

LEEDY, Presiding Judge.

Action to recover damages for the allegedly wrongful death of Howard Lee Richeson. Upon a trial in the Chariton Circuit Court his administrator, as plaintiff, was awarded judgment for $17,000 from which defendant prosecutes this appeal.

Preparation of a transcript on appeal was greatly impeded and made difficult by reason of the death of the court reporter, her death having occurred about nine months subsequent to the trial, but before she had prepared a full transcript of the shorthand notes taken at the trial, as requested by defendant. It should be stated that defendant's motion to reverse the judgment and remand the cause for new trial because of the supposed impasse created by this circumstance was overruled "without prejudice;" this on the theory that alternative

methods should first be attempted in settling and certifying a transcript to this court. It is unnecessary to refer to the considerable number of steps taken in the latter connection, it being sufficient to say that because of the exigencies of the situation, this court granted leave to defendant to file "a narrative statement in lieu of transcript." Compiled by his counsel, and consisting of about 20 pages, it purports to contain a résumé of the trial in its relevant incidents, including the proofs pro and con—all as recalled from memory "with strong help from rather copious notes taken * * * during the trial." Three other separately bound volumes supplemental to, and accompanying the "narrative statement" were filed, viz.: (1) Photostatic copies "of the files, court orders and docket entries" of the trial court; (2) a copy of the depositions of the following witnesses, each taken on behalf of defendant: W. H. Richeson, Cecil Irene Richeson, and Sharon Ann Richeson (being, respectively, the father, mother and sister of decedent) and marked "Exhibit A," and (3) a transcript of the testimony of the plaintiff, W. H. Richeson, given upon the trial (as furnished by the subsequently deceased official reporter for use on the hearing of the motion for new trial) and marked "Exhibit B." Plaintiff moved to dismiss defendant's appeal because of the inadequacies of the narrative statement, averring that the same "completely ignores the rules of this court, available sources of information * * * consists almost entirely of argumentative statements and shows on its face it is not an attempt in good faith to present the testimony given in this case." Notwithstanding these strictures, the motion concludes with this request: "In the event the court feels this motion to dismiss should be overruled, plaintiff respectfully requests that the court approve the narrative statement filed herein as the transcript on appeal and that this cause be docketed for determination on its merits." The motion to dismiss was overruled, and it was ordered that, in accordance with plaintiff's request, such narrative statement, together with the above described exhibits

and certified copies [of court files, etc.] be "taken as the transcript of the record on appeal." Such is the record before us and upon which we are asked to decide the questions presented. Even so, there are conflicts between some of the facts the narrative statement purports to detail and the same subject matter as portrayed by unchallenged photographs, plats, etc., in evidence, examples of which will be referred to in connection with the point or points to which they relate, and upon which they have some bearing. At this juncture we may add that such discrepancies have not simplified the court's task now at hand.

Decedent, Howard Lee Richeson, was the unmarried adult son of plaintiff, W. H. Richeson, and the latter's wife, Cecil Irene Richeson. He was born June 15, 1934, and died August 17, 1957 (after being removed to a hospital), as the result of injuries suffered earlier that day in the automobile accident out of which this action arises. He was riding as a guest-passenger of his 21-year-old friend and companion, the defendant, Donald Earl Hunziker, who was driving a 1950 or 1951 green Ford automobile owned by his father. No other persons were in the car. With defendant at the wheel, the car was proceeding southwardly on State Highway No. 11 enroute from Brookfield to Sedalia where the occupants expected to attend the State Fair. The casualty occurred about one-half mile south and east of a bridge or viaduct which carries the highway over and across the tracks of the Santa Fe Railroad. The facts immediately surrounding the casualty, and such others as may be pertinent, will be stated in connection with the point or points to which they relate.

Plaintiff submitted his case upon the hypothesis of defendant's negligence in driving at a high and excessive rate of speed under the circumstances shown in evidence, and, dependent on finding the issues for the plaintiff, the jury was also permitted to take into account aggravating circumstances, if any, attendant upon the fatality. The jury returned a verdict in favor of plaintiff in

thé sum of $17,000, and judgment was entered thereon.

§ 537.090 reads as follows: "In every action brought under section 537.080, the jury may give to the surviving party or parties who may be entitled to sue, such damages, not exceeding twenty-five thousand dollars, as the jury may deem fair and just for the death and loss thus occasioned, with reference to the necessary injury resulting from such death, and having regard for the mitigating or aggravating circumstances attending the wrongful act, neglect or default resulting in such death." (RSMo 1959 and V.A.M.S.)

Concededly, aside from regard to aggravating and mitigating circumstances, the recovery of damages under the foregoing section in this action must be limited to the pecuniary loss to the beneficiaries. Patison v. Campbell, Mo., 337 S.W.2d 72, 75; McCrary v. Ogden, Mo., 267 S.W.2d 670, 676; Hertz v. McDowell, 358 Mo. 383, 214 S.W.2d 546, 550. The point of difference between the parties in applying this principle to the facts of this case is best illustrated by the first of the reasons stated in support of the point assigning error in the overruling of defendant's motion for a new trial, the substance of which, *as developed in the argument portion of the brief,* is that there was no evidence "establishing that the deceased was performing services of a pecuniary nature to the plaintiff *at the time of his death."* (Italics ours.)

The first of the points relied on by defendant appears in his brief in this language: "The Court erred in overruling the motion of defendant for a new trial for the reason there was no evidence to show the plaintiff suffered any pecuniary loss and the verdict of the jury was a result of the prejudice, passion, bias and sympathy and was so excessive as to require a new trial or at least a remittitur." The reasons thus assigned as to why such ruling constituted error appear to be contradictory or inconsistent; that is, it is incongruous to say that plaintiff had no right of action (because the evidence failed to show he suffered any pecuniary loss) and in the same breath to assign excessiveness of the verdict so gross as to require a new trial or remittitur. We say this because the latter contention is, in effect, a concession that the evidence warranted a plaintiff's verdict, but in a lesser or reduced sum. To avoid foreclosing consideration of one or the other of such questions, we shall treat the reasons enumerated as constituting alternative assignments, and being contingent upon the disposition made of the preceding one.

We proceed to a consideration of the first aspect of the foregoing assignment under which the cases relied on by defendant are Wente v. Shaver, 350 Mo. 1143, 169 S.W.2d 947, 145 A.L.R. 1176; McCullough v. W. H. Powell Lumber Co., 205 Mo.App. 15, 216 S.W. 803, and Lynch v. St. Louis Public Service Co., Mo.App., 261 S.W.2d 521.

At the time of his death decedent was engaged in the antenna business in Brookfield. He had previously been employed there (perhaps since 1954), but he continued to reside at home with his parents until in the winter of 1955 or 1956 when he commenced maintaining a room in Brookfield. Being unmarried, he thereafter divided his time between Brookfield and the home place near Rothville, his father having testified that the son spent a third of the time at the latter place—evenings, nights, Sundays and holidays. The parents farmed extensively, operating 160 acres of their own land and 350 acres or more of rented land. Their tractors were equipped with lights. The father testified that his son would help do the spring plowing, spending several hours ("three to four, maybe five") per evening when he worked. He did so in 1956 from February through April, and after doing that he disked approximately 150 acres of the bean land, and cultivated alone 100 acres of beans. He helped with the harvest that fall which extended over a period of about twenty days, devoting to that work from one to two hours two or three evenings a week.

In the spring of 1957 he plowed as he did in 1956, except he did it five or six evenings a week for approximately four weeks. He also disked preparatory to planting corn, and cultivated 160 acres of the beans—all of it the second time by himself.

He also did the chores (feeding cattle and hogs, and helping with the cows) when his father would be absent on account of taking stock to the market, and also when his parents would be off visiting relatives in 1956 and 1957. Indeed, decedent did the chores on the night before his death.

The father further testified that in 1955 decedent (who was then staying nights at the home, and attained his majority on June 15) did approximately the same toward the farm work as he did in 1956. Moreover, in 1956 and 1957 decedent transported his mother from the farm to her place of employment in Marceline when she worked in the daytime. She did not have a driver's license, and if decedent had not done this, plaintiff testified he would have been required to stop his work to take her.

No reason is advanced as to why services of the nature outlined above were not of pecuniary benefit to the recipients; the contrary would seem to affirmatively appear from the mere statement of such facts. In a situation such as this, it is not necessary that the services (the pecuniary benefits) be physically rendered continuously and uninterruptedly up until the very time of death. (It is to be recalled, however, that here decedent did the chores the night before his death.) "The test of the right of recovery under our death statutes is the reasonable probability of pecuniary benefit from the continued life of the deceased, or a pecuniary injury from the death,—and not that of strict legal dependency. [Citing cases.]" Domijan v. Harp, Mo., 340 S.W. 2d 728, 734. None of the cases cited by defendant on this point are sufficiently parallel on their facts as to control the case at bar. We are of the opinion that the evidence was sufficient to justify an inference of decedent's probable willingness and ability to continue such services in the future, and hence to bring the case within the rule last stated.

■ By instruction No. 5 the jury was permitted to take into consideration the aggravating circumstances, if any, attendant upon the fatal injury. This is assigned as error, not because of the form of the instruction, but solely because there was allegedly no evidence to warrant such a submission.

The rule governing the submissibility of aggravating circumstances in an action such as this appears in one form of statement or another throughout the cases, but the following is a fair rescript of it: "Now to whatever extent the damages are increased by reason of aggravating circumstances attending the death of the deceased, such increase is punitive in its nature; and therefore to constitute evidence of a character to warrant the submission of the issue of aggravating circumstances there must be a showing of willful misconduct, wantonness, recklessness, or a want of care indicative of indifference to consequences. In other words, if the evidence shows only that the accident was the result of a want of due care on the part of the defendant or his agent, then the case is merely one of negligence and nothing more; but if it shows that the negligence of the defendant or his agent was attended and accompanied by such circumstances as to evince a reckless disregard of the rights of others, then the jury have the right under the statute to take such aggravating circumstances into consideration in determining the amount to be allowed the plaintiff or plaintiffs, and an instruction so informing them is consequently proper." Williams v. Excavating & Foundation Co., 230 Mo.App. 973, 93 S.W. 2d 123, 127, as quoted with approval in Mauzy v. J. D. Carson Co., Mo.App., 189 S.W.2d 829, 837.

In the application of the foregoing rule plaintiff is entitled to a consideration of the evidence most favorable to him on the issue of liability and aggravating circum-

stances, and evidence on behalf of defendant will be disregarded unless aiding plaintiff's case. It will be recalled that the accident occurred about one-half mile south and east of the overpass or bridge across the Santa Fe tracks. There is some confusion as to the exact layout of the roadway. The narrative statement says that "leaving the south edge of the bridge, the roadway slopes downward for a short distance, *turns to the west two or three hundred feet,* then goes nearly straight south for approximately one-half mile, where it makes a slight curve to the east and then straight to the brow of a hill," whereas the photographs and profile map in evidence show quite distinctly, as respondent's brief points out, that "the highway proceeds *perfectly straight from the south end of the overpass* over the Santa Fe Railroad for about half a mile where, proceeding southwardly, it curves to the left, or to the southeast." (All italics supplied.) It appears from the photographs that southward from the overpass, the highway was somewhat upgrade to a point beyond the curve to the left, where it leveled off and continued so for at least a distance of several hundred feet. There had been placed on the west side of the roadway a windrow of crushed rock (the starting point of which is obscure, being either "at a point a short distance south of the *first* curve" (as the narrative statement says) or "just before coming to *the* curve [the only one shown in the photographs]," as insisted by plaintiff. The windrow extended upon, along and into the west edge of the roadway for the entire distance to the top of the hill. There was a ditch 8 or 10 feet wide and approximately 3 feet deep extending along the west side of the highway for the entire distance. The windrow extended from the east edge of the ditch to and into the west edge or lane of the highway. The windrow was pyramidal in shape, composed of crushed rock of uniform size, and was described as being about one foot high and two feet wide (according to the testimony of a highway patrolman), or "approximately two feet high and five feet at the base throughout

its entire length," as related in the narrative statement.

There were apparently no eyewitnesses to the casualty other than decedent and defendant, and defendant did not testify, so the facts immediately surrounding the accident necessarily appear by circumstantial evidence. Without lengthening this opinion by detailing the testimony of the witnesses individually, it will be sufficient to say that the evidence was such as to have warranted the jury in finding that the casualty occurred in daylight on a mid-August day; there was no intimation of bad weather, rain or slick pavement; the road was old and the surfaced portion somewhat narrow (less than 20 feet, as we understand) and uneven; that as defendant approached the curve to the left, he was driving at a rapid rate of speed when his car struck the windrow of crushed rock, traveled 230 feet straddling it, then skidded 127 feet along and across the blacktop to the shoulder on the east side. It continued on along the shoulder for 132 feet, leaving four one-foot wide tire marks thereon which commenced at the east edge of the pavement and were parallel to the blacktop. During this 132 feet there were "dug up and gouged out" places 2 feet in diameter and 10 or 15 feet apart which had been made by the car when it was turning over. (It was the opinion of one witness, a highway patrolman, that the car turned over four times; there was other evidence indicating two and one-half times.) The car continued on in the same direction, and finally came to rest upside down 150 feet from the end of the 132 feet of tire marks, and was facing west, partially on the shoulder and partially in the adjacent unfenced corn field. There was also opinion evidence by a plaintiff's witness, testifying as an expert, that based on data respecting skid marks and the application thereto of standard formulas and tests as made by himself, defendant was traveling at the rate of 75 to 100 miles per hour. There was also testimony by the driver of a car whom defendant had overtaken and passed on the highway a relatively short distance north

of the site of the accident from which it was inferable that the speed of the car approximated that fixed by the expert. Plaintiff's witness Green, a highway patrolman, testified to a conversation he, the witness, had with defendant the next day in which the latter stated he thought he was traveling 60 or 65 miles per hour when he was crowded by an oncoming car, and in turning struck the windrow of rock and his car went out of control. Plaintiff also offered excerpts from the defendant's testimony at his preliminary hearing on some criminal charge growing out of the accident, as follows: That he was traveling between 60 and 65 miles per hour when he hit the gravel and lost control; that his car went crosswise, that he tried to turn it straight, then tried to turn it the other way, that it skidded, and then he didn't remember.

The particular in which it is claimed the evidence was so wanting as to render it insufficient to authorize the submission of the issue of aggravating circumstances is "that there was no evidence which indicated in the least that the defendant, Donald Earl Hunziker, could or should have seen the windrow of rock that caused the accident in time to have avoided the accident." We are of the opinion that the contrary might reasonably have been inferred from the facts and circumstances we have detailed. The accident occurred in broad daylight, and there is not the slightest suggestion in the evidence that the windrow was not visible, or that it was in any way obscured from the view of the driver of an approaching vehicle. It is not required that there be direct evidence of aggravating circumstances so as to entitle plaintiff to submit that issue, but the same may be made to appear circumstantially, and for this purpose we think the showing made was amply sufficient. In addition, it is to be noted that the car's rate of speed was so high that after straddling the windrow, it skidded 259 feet on the blacktop surface and shoulder, and still had sufficient momentum to turn over several times before finally coming to rest more than 600 feet from the point of impact with the windrow. While not relevant to the precise point made by defendant, it is perhaps not improper to remind also that the jury was at liberty to accept or reject all or any part of the statements shown by plaintiff to have been made by defendant, and hence it was not bound to believe that defendant was in fact crowded by an oncoming car, and there is no suggestion in the record even remotely tending to corroborate that portion of his statement. We hold the issue of aggravating circumstances was for the jury. Marlow v. Nafziger Baking Co., 333 Mo. 790, 63 S.W.2d 115; Spalding v. Robertson, 357 Mo. 37, 206 S.W.2d 517; Hausherr v. Kansas City Public Service Co., Mo.App., 268 S.W.2d 433; Shepard v. Harris, Mo., 329 S.W.2d 1; Hertz v. McDowell, supra.

■ Other points have been briefed, but we find it utterly impossible to fairly or accurately evaluate their merits because of the confused state of the record upon which the cause has been submitted. There are recitals in the narrative statement which, if they accurately reflect the incidents they purport to portray, are such as to cause grave concern. The narrative statement is in some respects obviously garbled, or else it is subject to the serious objections originally leveled against it by plaintiff's counsel. It is deficient in failing to disclose if objections were actually made, and the grounds thereof, to what might under certain circumstances be regarded as quite prejudicial evidence and untoward incidents (if they occurred) so numerous and repeated as to perhaps warrant a new trial. Of course, it is not to be expected that the precise grounds of objections could be recalled by counsel after the long lapse of time here involved. On the other hand, except in instances falling within the purview of Rule 79.04, V.A.M.R., error may not be predicated on objections urged for the first time on appeal, and which were not interposed at the trial. It is true that plaintiff has agreed that defendant's narrative statement be taken as the transcript, but even so we are unwilling to affirm on

such a nondescript and obviously inaccurate and incomplete record. We have, however, ruled the basic questions that are likely to recur on a trial anew. Because the inability to present a conventional transcript on this appeal is not due to the fault of the appealing party, and because of the futility of undertaking to pass on the other questions sought to be presented, we have concluded that the judgment appealed from should be reversed, and the cause remanded so as to afford a more adequate and acceptable method of testing the rights of the parties on appellate review of such other questions than is possible under the present record. The judgment is accordingly reversed, and the cause remanded.

All concur.