Fred HARTZ and Dora Hartz, Plaintiffs-Respondents,

v.

Emory HEIMOS, Defendant,

and

Kirby Shoults, Defendant-Appellant.

No. 48506.

Supreme Court of Missouri,

Division No. 1.

Jan. 8, 1962.

William K. Stanard, II, St. Louis (Carter, Bull & Baer, St. Louis, of counsel), for appellant, Kirby Shoults.

Thomas W. Challis, Jr., Flynn, Challis & Sumner, William L. Mason, Jr, St. Louis, for respondents.

DALTON, Judge.

Action for damages for the wrongful death of plaintiffs' eighteen-year old, unmarried and unemancipated daughter, Geraldine Rita Hartz. Verdict and judgment were for plaintiffs for $25,000, and defendant Shoults has appealed.

Plaintiffs' daughter was struck and killed about 7:20 p. m. on November 24, 1959, by a southbound automobile alleged to have been operated by defendant Shoults. She was standing in the center of, and attempting to cross, Lemay Ferry Road in front of an A & P store, located in the 200 block on the west side of the highway in St. Louis County. The action was instituted against defendant Shoults and one Emory Heimos, who, at the same time and place, was operating an automobile in the opposite direction on the same highway, but, on trial against both, the jury found the issues in favor of defendant Heimos and plaintiffs filed no motion for a new trial.

∎ The cause was submitted to the jury against defendant Shoults solely on the theory that he was negligent in failing to keep a proper watch and lookout while operating his automobile at the time and place in question and that by reason of such negligence he struck and killed plaintiffs' decedent. Since the first assignment on this appeal is that there was no substantial evidence that defendant Shoults failed to keep a proper watch or lookout, or that any such failure caused Geraldine's death, a statement of the evidence favorable to plaintiffs is required. We shall disregard defendant's evidence unless it aids the plaintiffs' case and also disregard evidence affecting the credibility, weight and value of plaintiffs' evidence.

The jury could have found the facts to be substantially as follows: The 200 block on Lemay Ferry Road was built up as "a pretty well congested business district." The highway was paved through the area; it was level and had four lanes but the two outside lanes were used for parking and only two lanes for traffic, one north and one south. The traffic lanes were approximately nine feet in width. A filling station was located across from the A & P store, but a little to the north of the main entrance. The highway curb was directly in front of the main entrance to the store.

At the time in question cars were parked on each side of the highway but none in front of the entrance to the filling station opposite the north part of the A & P store. It was a clear, dry night and driving conditions through the area were normal. Although at 7:20 p. m. it was dark, the area in the 200 block was well illuminated by artificial lighting, chiefly from the business houses. There was no regular crossing for pedestrians immediately in front of the A & P store but pedestrians regularly crossed in that area, since it was 750 feet to the Fanny Street intersection to the south, where a school crossing was marked by lines, and it was approximately 300 feet to the north to where Wachtel and Military Avenues intersected in a "Y" with Lemay Ferry Road. A white line was painted down the center of the highway.

On the evening of November 24, 1959, shortly after 7 p. m., Roger Lutz, Geraldine's boy friend, met her and she asked him to take her out on Lemay Ferry Road to make some purchases at the A & P store. He let her out in front of the store on the right-hand, west side of the highway and he proceeded on south to a filling station where he purchased some gasoline and came back north on the east side of the street and parked his car opposite the A & P store and a little north of its main entrance, where he awaited Geraldine's return.

About 7:20 p. m. he saw her come out of the store carrying a bag of groceries and stop on the west curb directly in front of the main entrance to the store. She was then about a half a car length behind and across the street from his parked car. He looked away and started his motor and as he did so he heard two distinct noises which "sounded at first like two cars hitting together," but it happened fast. He looked

back and saw someone's body hit and land upon the hood of an automobile going north and he saw the body start rolling. He didn't then realize it was Geraldine. He investigated at once and found her body lying on the center line of the street, her head toward the south and her feet toward the north. She was then unconscious.

As stated, at the time and place in question, Emory John Heimos was driving his 1957 Bellaire, four-door Chevrolet sedan north on Lemay Ferry Road in the lane of travel for northbound traffic. He was taking his mother to the doctor. The left side of his car was approximately three feet from the center line. He was driving at twenty miles per hour. As he was passing through the 200 block and in front of the A & P store, there was traffic ahead of him and behind him, but not close behind him. He looked ahead and saw Geraldine wearing a black coat and standing in the middle of the street on the white line two or three car lengths ahead. She was facing east, standing still and looking southeast, somewhat in the direction from which his car was approaching. At that time there was a steady stream of southbound traffic on the same highway. When his car reached the entrance to the service station opposite the A & P store, he saw the girl's body flying through the air toward his car and he put on his brakes an instant before the impact. He had continuously watched the girl from the time he first saw her, but he did not see her move until he saw her "flying through the air toward his car." While he had not taken his eyes off of her, he "did not actually see a car strike her." Her body landed on the hood of his car and then went off and landed in the street, probably a car's length ahead.

Geraldine was immediately taken by ambulance to the St. Louis County Hospital, where she was pronounced dead. A postmortem revealed that she had sustained extensive lacerations and a "crescentic evulsion" of the left hip, crescent shaped as if caused by a motor vehicle fender, also a star-shaped gouge on the right thigh, numerous fractures of the ribs and an extensive fracture of the skull.

When a St. Louis County police officer arrived at the scene, he found Geraldine's body on the center line of the highway and about fifteen to twenty feet north of the entrance to the A & P store. There were no skid marks observable on the highway and, aside from blood, the only other evidence found on the highway was small bits of glass and bits of plastic from Geraldine's compact, about twenty-eight feet south of where her body was found.

After the ambulance moved the girl's body, Heimos took his mother to the doctor and on the way noticed that his left front headlight had burned out. The glass was not broken and he had the sealed-beam unit removed and replaced with a new one. In addition, he noticed that there were two small dents on the hood of the Chevrolet, where Geraldine's body had landed.

Defendant Shoults resided near Festus, Missouri. He was 43 years of age and was employed by the Pittsburgh Plate Glass Company at Crystal City. He owned a light green, 1957 Pontiac automobile with a dark green top. On November 24, 1959, the car was "quite dirty." On the night of the 23rd Shoults had slept only about four hours and a quarter, and then gotten up and gone to work at midnight. He worked from midnight until 8 o'clock on the morning of the 24th. He left his home about 2:30 in the afternoon and drove to St. Louis and left downtown in St. Louis at about ten minutes after six. He purchased gasoline at a station on South Broadway and passed along and through the 200 block of Lemay Ferry Road at approximately 7:20 p. m. He drove in the southbound lane at about 20 m. p. h. No one was with him. He was in a normal condition and not sleepy. In going through the area where the A & P store is located, he did not swerve his car, apply his brakes or sound any warning, and he did not see Geraldine standing in the center of the street, although he said he was looking straight down the road. His headlights

were on dim, they were pretty good headlights and showed the road ahead for the normal distance. There was artificial illumination around the area in addition to his headlights. Nothing happened to divert his attention prior to the time that he heard a thud on the left side of his vehicle. He did not look around to see what caused it. He did not see anything at that time and didn't stop or slacken speed, but drove on about a block or more and stopped momentarily and noticed an indentation on his left front fender. He did not get out of the car to examine the fender or go back to the place he heard the thud, but went straight on to Festus and to his home and to bed. The first time he knew that a pedestrian had been killed in the mentioned area was at the breakfast hour the next morning. He then went out and looked at his and observed that the dirt had been removed from the left headlight area of the car and the headlight rim was recessed, "pushed back." He also observed the dent he had observed the night before on top of his left front fender. He also observed "some grease apparently that was on my headlight rim, and at the top of my headlight rim was sort of polished clean, no dirt in there such as balance of my car is all over." He did not observe any fiber or fabric about the headlight rim or indentation on the fender. He returned his car immediately to the St. Louis County Police in the condition in which it was then in and told them the approximate hour and approximate location in which he had heard the thud and later observed the dent on his car.

A member of the St. Louis County Police Department took pictures of the Shoults car and removed some black wool fibers from the crushed paint in the dent in the left front fender. He also took some scrapings of paint from the Shoults car. The fibers and paint scrapings were examined by a chemist for the St. Louis Police Department and he found the fibers corresponded with the fibers from Geraldine's coat, but he could not say they came from the coat. He also found paint in and on Geraldine's coat that corresponded with the scrapings from the Shoults car, but he was unable to say that the paint came from that car. The light green paint chips taken from the Heimos car had a tan undercoating, while the light green chips from the Shoults Pontiac had a black undercoating.

At the time and place in question one Singer was looking out of the front window of his auto parts store on the east side of Lemay Ferry Road, across from the A & P store. He did not see Geraldine standing in the center of the highway, but he heard a thud and then saw the girl "coming through the air" and come into contact with a northbound automobile. He heard two thuds and ran out and saw the girl's body on the pavement 35 to 50 feet north of where he had first seen her in the air. He also saw the rear end of a dark car going south. It didn't stop. Another witness saw a "dark car," operated by a man and going south at about 30 m. p. h. immediately after the witness had heard a crash and had seen "a girl crumbling into the street."

Appellant insists that the court erred in overruling his motion for a directed verdict offered at the close of all the evidence because there was no evidence of negligence on his part or as to what negligence caused Geraldine's death. Appellant argues that no one saw him on the night of the occurrence; that in any case he was looking straight down the road and he didn't see the deceased; and that no inference of negligence in failing to keep a proper watch and lookout can be drawn from his testimony, or from the evidence in the case. Appellant says the cause was submitted on "speculation and conjecture" as to whether any negligent failure to keep a proper lookout was the proximate cause of Geraldine's death, and that "the jury would have had to speculate as to whether or not the girl stepped back into the southbound lane." Berry v. Harmon, Mo.Sup., 323 S.W.2d 691. Appellant argues that a "quite dirty," light green car with a dark green top was not a "dark car"; that no one testified as to any negligent failure on his part to keep a lookout, or saw

his car strike Geraldine; that "in the absence of substantial evidence from which a jury could find that in the exercise of the highest degree of care he could have seen the girl in time to avoid hitting her" no case was made for the jury (O'Neill v. Claypool, Mo.Sup., 341 S.W.2d 129); and that the evidence, considered as a whole, does not have a tendency to exclude every reasonable conclusion other than negligence in failing to keep a lookout. Osterhaus v. Gladstone Hotel Corp., Mo.Sup., 344 S.W. 2d 91.

We have carefully examined the evidence in view of each of the foregoing contentions as to the sufficiency of plaintiffs' evidence to make a case for the jury and we have reached the conclusion that a submissible case was made out on the issue of negligence submitted.

■ There can be no objection to one's establishing negligence and proximate cause by circumstantial evidence. "Of course facts essential to a recovery may be proved by circumstantial evidence, but the shown circumstances must be such that the necessary facts may be inferred therefrom and they must reasonably follow. The evidence must 'exclude guesswork, conjecture, and speculation as to the existence of the necessary facts.'" Brawley v. Esterly, Mo.Sup., 267 S.W.2d 655, 659; Berry v. Harmon, supra; Osterhaus v. Gladstone Hotel Corp., supra.

■ The evidence shows there was sufficient artificial illumination in the area for one to see a person in the street for several car lengths, without the aid of headlights. It was in a congested business district with stores and parked cars on each side of the highway. Geraldine was standing still in the center of the street, on the white line at the edge of the 9 foot southbound lane, when she was struck by a southbound car. She had crossed from the west side to the center, crossing the southbound lane. Defendant Heimos, operating his northbound car, had observed Geraldine standing on the center line of the street when his car was "two to three car lengths" to the south, and he watched her as his car approached her location. Her impact with his car did not occur until his car had reached the service station entrance. Appellant admitted driving south through the mentioned area at approximately the same time Geraldine was killed. In that area he heard a noise, a thud at the left of his car. His car windows were up and he did not locate the thud and did not stop, until a block or so beyond the A & P store. He then for the first time observed the dent in his left front fender. The next morning he observed the "pushed back" left headlight and the mentioned dent, and he noted that the dirt had been removed from around the headlight and from part of the left front fender. Subsequently, wool fibers taken from the dent and fender were shown to correspond with wool fibers taken from Geraldine's coat and particles of paint taken from her coat were shown to correspond with paint from appellant's car. A "dark car," southbound and occupied by a man, was seen leaving the area at 30 m. p. h. as Geraldine's body was "crumbling in the street." At no time did appellant see Geraldine, or see any reason to apply his brakes, swerve or slacken speed, but Geraldine was there and could have been seen, as the evidence shows. Had appellant seen her standing on the center line of the highway, at the edge of the nine foot southbound lane, he could have passed her without striking her. "Where one is charged with the duty to look and to look is to see, he must be held to have seen what looking would have revealed." Weis v. Melvin, Mo.Sup., 219 S.W.2d 310, 311; Wilkins v. Stuecken, 359 Mo. 1047, 225 S.W.2d 131, 134. The evidence was substantial and sufficient to sustain a finding that appellant negligently failed to keep a lookout; that, if a proper lookout had been kept, Geraldine could have been seen standing on the center line in the street in time for appellant to have avoided a collision with her; and that appellant's negligent failure to keep a proper lookout was the direct and proximate cause of the collision and her death.

Appellant further contends that the court erred in giving Instruction 3, plaintiffs' verdict directing instruction against defendant Shoults, (a) because there was no substantial evidence to support the required finding by Instruction 3 that defendant Shoults "failed to exercise the highest degree of care in that he drove the automobile he was operating at the time and place mentioned in evidence, if you so find, into the person of Geraldine Hartz, without maintaining a proper watch and lookout, if you so find"; and (b) because Instruction 3 failed to require a finding that failure to keep a proper watch and lookout was negligence and failed to specify what negligence resulted in the collision and allowed the jury to indulge in speculation and conjecture and gave them a roving commission.

■ In support of assignment (a) appellant re-argues his contention that there was no substantial evidence in the record tending to show that he failed to keep a proper watch or lookout or that such failure caused the death of Geraldine Hartz. Appellant relies strongly upon his own testimony. Although defendant Shoults was called as a witness by the plaintiffs, the plaintiffs were not bound by his testimony that at the time and place he was exercising the highest degree of care and kept a prudent lookout, since plaintiffs offered other evidence from which a contrary inference could be drawn. Frank v. Wabash R. Co., Mo.Sup., 295 S.W.2d 16, 22(14); Klotsch v. P. F. Collier & Son Corp., 349 Mo. 40, 159 S.W.2d 589, 594 (7); Cook v. St. Joseph Ry., Light, Heat & Power Co., 232 Mo.App. 313, 106 S.W.2d 38, 44(4). In view of our holding with reference to the sufficiency of the evidence to make a case for the jury on the issue of negligence upon which the cause was submitted, it is only necessary to say that we find no merit in assignment (a).

■ Only a general objection was interposed to the giving of Instruction 3 when it was given. Only objection (a), above, was set forth in defendant's motion for a new trial, except for a further statement that the instruction "calls for mere speculation and conjecture on the part of the jury." Hence, the first part of objection (b) appears for the first time in appellant's brief on appeal. This part comes too late for consideration by an appellate court. Supreme Court Rule 79.01 and 79.03, V.A.M.R. Sullivan v. Hanley, Mo.App., 347 S.W.2d 710, 711. However, we find no merit in the particular objection, since the instruction required a finding of the failure to exercise the highest degree of care in the operation of his automobile in that he drove his automobile into the person of Geraldine Hartz, without maintaining a proper watch and lookout. The contention that the instruction calls for mere speculation and conjecture on the part of the jury is not developed in the argument, except by appellant's statement that "the instruction failed to provide the jury with any guide or standard by which to determine what particular acts or omissions would constitute negligence"; and that nowhere in the instruction was the jury told what negligence was, and it was therefore "an invitation to them to indulge in the wildest surmise and speculation."

The instruction is not erroneous in the respects mentioned, since it required a finding of failure to exercise the highest degree of care in driving his vehicle into and upon Geraldine without maintaining a proper watch and lookout. Such a finding constituted a finding of negligence. The instruction further required a finding that Geraldine was killed as a result of the conduct of defendant Shoults as submitted in the instruction. The assignment is overruled.

Appellant further contends that the court erred "in refusing to grant a new trial on the ground that the verdict was excessive, and was the result of bias and prejudice, and misconduct on the part of the jury." It is clear from this assignment of error and the printed argument in support thereof that the only relief sought is a new trial on the issue of damages. Knight v. Swift & Co., Mo.Sup., 338 S.W.2d 795, 801(11–12).

We have heretofore set out the facts and circumstances attending Geraldine's death

and it is now only necessary to further say that the evidence tends to show that Geraldine was 18 years, 2 months and 6 days old at the time of her death. She resided with her parents and was employed by the Zumwalt Company, where she had worked regularly for ten months. Her rate of pay was $1.10 per hour. Her particular position with the company was "receptionist and in charge of typing all contracts that left the office." She was a healthy girl, 5 feet 7 inches tall and weighing 165, and she had never been in any trouble. She had attended high school for three years and then attended Rubicam's business school, where she graduated. She took shorthand and bookkeeping. She was a cheerful and mature person, had a charming personality and was dependable in her work. She dressed conservatively and in good taste, made a fine appearance and was "loved by anyone whoever knew her." She was not engaged to be married. Off hours and on week ends she worked about her home doing housework for herself and her parents. Her parents paid her funeral expenses in the sum of $1,541.65.

As to the amount of damages recoverable, Section 537.090 RSMo 1959, V.A.M.S., provides: "In every action brought under section 537.080, the jury may give to the surviving party or parties who may be entitled to sue such damages, not exceeding twenty-five thousand dollars, as the jury may deem fair and just for the death and loss thus occasioned, with reference to the necessary injury resulting from such death, and having regard for the mitigating or aggravating circumstances attending the wrongful act, neglect or default resulting in such death."

■ Appellant refers to the statute, Section 537.090, and to certain cases dealing with the measure of damages for the wrongful death of a minor child, and then argues as follows: "Inasmuch as the pecuniary loss in this case was negligible, it must have been the slender reed of 'aggravating circumstances' upon which the jury relied in arriving at a verdict of twenty-five thousand

dollars; and the defendant earnestly urges that in so doing, the jury had no justification and was motivated by bias and prejudice." Appellant says the jury "wrongly regarded this case as one of hit and run driving." Appellant further contends that "in the instant case there was no evidence of aggravating circumstances, and the jury's verdict was based on bias and prejudice alone, and was therefore misconduct requiring a new trial." However, the issue of mitigating or aggravating circumstances was submitted to the jury by plaintiffs' Instruction No. 7 on the measure of damages, and, while defendant Shoults objected to the instruction at the time it was given, the instruction was not mentioned or referred to in his motion for a new trial, and the giving of it is not assigned as error on this appeal. Under such circumstances we are not called upon to determine whether mitigating or aggravating circumstances were properly submitted to the jury. However, see Richeson v. Hunziker, Mo.Sup., 349 S.W.2d 50, 53.

■ No question as to contributory negligence of the deceased was an issue in the case, as no instruction was offered thereon. Shepard v. Harris, Mo.Sup., 329 S.W.2d 1, 6.

In support of his contention that a new trial should be granted on the issue of damages, appellant relies particularly on Parsons v. Missouri Pac. Ry. Co., 94 Mo. 286, 6 S.W. 464, decided in 1888, where for the pecuniary loss resulting from the wrongful death of an eighteen-year old minor child the jury returned a verdict for $5,000, the maximum benefits then allowable. The case was reversed on appeal on account of the giving of an erroneous instruction on the measure of damages, which instruction the court held to be prejudicial in view of the amount of the verdict returned by the jury. The court said: "The cause of it was, doubtless, not that the jury were influenced by either prejudice or passion, but that they were not sufficiently informed as to the proper standard by which the damages ought to have been measured, owing to the

very general terms of the instruction given upon that subject."

In that case "there were no circumstances shown indicating willfulness, malice, wantonness, recklessness, or conscious negligence, or any wrong intent that could be made the basis of a verdict for aggravated, exemplary, or punitory damages." The court further said: "In that class of cases in which the jury would be warranted in giving exemplary damages, by reason of the circumstances of aggravation attending the act, the amount must necessarily be left, within the limit of the statute, to the fairness and sense of justice of the jury, discharging their duty uninfluenced by prejudice or passion, and as to such damages no standard for their admeasurement can be given by the court." The case does not aid appellant. Aside from the fact that the value of money has changed since 1888 the appellant here, as stated, does not complain in any manner of the form of the instruction submitting the issue of damages and mitigating or aggravating circumstances to the jury.

Apparently, the legislative intent as expressed in Section 537.090 "is to give the jury a broad discretion in computing damages in actions for wrongful death, within the limit prescribed, based upon the pecuniary loss of every kind and character which, under all the circumstances of the particular case, will be sustained by those entitled to recover as a direct result of the death, and based also upon circumstances in mitigation or aggravation of the wrongful act, neglect, or default which caused it; and that this discretion given the jury in computing fair and just damages should not be interfered with unless it has clearly been abused." Steger v. Meehan, Mo.Sup., 63 S.W.2d 109, 115; Patison v. Campbell, Mo. Sup., 337 S.W.2d 72, 75.

■ The question of whether the verdict was so grossly excessive "as to be conclusive evidence of the fact that it was the result of passion and prejudice on the part of the jury and of misconduct on their part against the defendant" was presented to the trial court by defendant's motion for a new trial and it was overruled. The trial court was entitled to weigh the evidence and infer bias and prejudice from the size of the verdict alone. Mitchell v. Pla-Mor, Inc., 361 Mo. 946, 237 S.W.2d 189, 192(6-8); Parks v. Thompson, 363 Mo. 791, 253 S.W.2d 796, 798. The verdict has had the approval of the trial court.

The record does not disclose any occurrence during the trial of the cause from which we would be justified in finding misconduct or concluding that the jury was in any-wise prejudiced against this appellant. The only basis suggested for an inference that there was, in fact, any bias and prejudice on the part of the jury is the amount of the verdict. But, "even if excessive, the amount of an award does not, in and of itself, show passion and prejudice." Brewer v. Rowe, 363 Mo. 592, 252 S.W.2d 372, 376 (6); Loveless v. Locke Distributing Co., Mo.Sup., 313 S.W.2d 24, 33; O'Brien v. Louisville & Nashville R. Co., 360 Mo. 229, 227 S.W.2d 690, 693; Knight v. Swift & Co., supra, 338 S.W.2d 795, 802.

In the case of Brewer v. Rowe, supra, a judgment of $15,000 for the pecuniary loss sustained by reason of the wrongful death of an eleven-year old child was permitted to stand, although it was for the maximum amount allowable under the then statute. In the case of McCrary v. Ogden, Mo.Sup., 267 S.W.2d 670, 676, this Court permitted a $10,000 verdict to stand in a wrongful death action wherein the deceased was seventeen years and ten months of age, and only pecuniary loss was involved. The Court pointed out that the amount of a verdict in a wrongful death case wherein the deceased is a minor necessarily involves some speculation on the part of the jury. In the case of Shepard v. Harris, supra, 329 S.W.2d 1, the deceased was seventeen years and seven months of age at the time of his death and both pecuniary loss and aggravating circumstances were submitted, and a $15,000 judgment for wrongful death was permitted to stand.

On the record in the instant case, and in view of the issues submitted to the jury, we are satisfied that this Court should not interfere with the jury's verdict, which the trial court has approved as a fair and just amount for the necessary injury resulting from Geraldine's death, having regard for the aggravating circumstances which attended the negligence resulting in such death.

The judgment is affirmed.

All concur.