**Cornell TRIPP and Beatrice K. Tripp, Respondents,**

**v.**

**Wendell CHOATE and Bruce Larkins, a Partnership, d/b/a Larkins and Choate, Appellants.**

**No. 52310.**

Supreme Court of Missouri, Division No. 2.

June 12, 1967.

Joslyn & Josyln, Charleston, for respondents.

Dwight Crader, Sikeston, for appellants.

BARRETT, Commissioner.

In this action for the wrongful death of their son Ronnie Tripp, age 16, while employed by the appellants, Choate and Larkins, a jury awarded the parents, Cornell and Beatrice Tripp, $25,000.00 damages. The charge and submission of negligence and liability was that his employers knowingly used Parathion DDT, a poisonous chemical, as a corn spray and directed Ronnie's mixing of the chemical with water but "failed to provide reasonably safe protective devices" resulting in Ronnie's death.

Since 1958 Wendell Choate and Bruce Larkins have successfully specialized in the production and marketing of sweet corn. The particular part of their large commercial enterprise involved in this action is a partnership in 250 acres of land near Dorena in Mississippi County. This phase of the operation was immediately directed by Larkins with three employees, Willmor Caldwell, a supervisor with eight years' experience in growing sweet corn, Pete Smith, a laborer, and for ten days in June 1964 Ronnie Tripp, also a laborer.

From the beginning of their sweet corn operation Choate and Larkins employed Parathion DDT as an insecticide. The dictionary definition of parathion is an "insecticide * * * of extreme toxicity to mammals as well as insects." Webster's Third New International Dictionary. To apply the chemical on this 250-acre tract they employed two "Hi-boys," three-wheeled machines for "high clearance spraying" of eight rows of corn at a time. Mounted on each hi-boy was a 200-gallon tank with necessary motors to propel the machine and spray its contents. The corn was sprayed more than once a season but during a spraying operation Caldwell said they sprayed 10 to 70 to 100 acres a day. A 200-gallon tank emptied every 30 to 35 minutes and so had to be refilled twice an hour or for the two machines four times in an hour. The Parathion DDT came in 55-gallon drums and it was Ronnie's job to draw the chemical from the drums and mix it with water in the 200-gallon tanks, three and one-half gallons of chemical to 200 gallons of water. At the end of the field there was a one-thousand-gallon water tank with a twelve-foot hose, the machines stopped near the water tank and Ronnie would insert the hose in the top of the spray tank, start the water running, draw from the "spring-load bung" of the drum 3½ gallons of Parathion DDT in a fiber glass container with a spout, reach up "shirt-pocket high" and pour the chemical into the tank and close its lid. He withdrew the hose from the spray tank and replaced it on the water tank. Mr. Larkins was of the opinion that 55 gallons of Parathion DDT were used each day and that the spray tanks were filled approximately 15 times each day. He said that from reading the labels on the drums he had learned that Parathion DDT was "poison, that's one thing, for sure, I can remember. It does say they are poison." And during his spraying operations over the years he had had employees who became ill from the chemical and he had taken them to doctors and hospitals for treatment. The supervisor, Caldwell, said that the chemical had a distinct odor and he knew that it was dangerous and "believed it would" kill human beings.

Larkins said that he was not present when Ronnie started to work and he left it to Caldwell to instruct Ronnie as to his duties and to warn him of the dangers incident to the tasks. But he had personally instructed Caldwell and others "to be careful with the DDT and Parathion. To be careful of the machines because they would turn over. Be careful and cautious and if he did spill any of the chemical on him to wash it off if it was on his skin. If it was on his clothes, to go home immediately and change clothes and take a bath. Not to smell any of the vapor, always park the machines and stay on the upwind side of them." Caldwell said that he instructed Ronnie "whenever he was handling it, to wash his hands and never to go down through a field that has been sprayed, and if he was running the machines and one of

his nozzles happened to stop up, not to attempt to unstop it to reach the end, and if he got any on him, to go home and change clothes and wash it immediately, and I always told him to smoking a cigarette, to catch it with two fingers and take the bottom side up to smoke it." And he "was always told to stay on the upwind side." This was the extent of the warning to Ronnie and the extent of Choate's and Larkins' instructions to employees.

The conspicuous label in black and red type on yellow paper, together with skull and crossbones, had this warning in capital letters: "WARNING. POISONOUS IF SWALLOWED, INHALED OR ABSORBED THROUGH SKIN." Beneath the warning in capital letters were these further warnings and specific instructions (emphasis supplied): *"Rapidly absorbed through skin. Wear natural rubber gloves, protective clothing and goggles.* Do not get on skin or in eyes or clothing. In case of contact remove clothing, wash thoroughly with soap and water * * *. Do not breathe spray mist or vapors. *Wear a mask or respirator* of a type passed by U. S. Department of Agriculture *for Parathion protection.* Keep all unprotected persons and animals out of operating area or vicinity where there may be danger of drift. * * * *Wear clean clothing daily.* Wash all contaminated clothing with soap and hot water before re-use. Wash hands, arms and face thoroughly with soap and water before eating or smoking."

Choate, Larkins and Caldwell had all read that label and despite its specific instructions no gloves, goggles, respirators or protective clothing were furnished. Caldwell said that he followed the instructions of Choate and Larkins but he never knew that these protective devices were required and as to the label he said, "I had read it but slipped my remembrance." Choate and Larkins had two respirators but they were never used or offered to employees. Choate remembered some of the instructions on the label but he said that there was "Not that I know of" any spe-

cific direction to wear rubber gloves. As to protective clothing or goggles he said, "If there is, I don't remember." Larkins knew that Parathion was "poison, that's one thing for sure" but he could only remember the directions as to washing "if you spill any on you," he did not remember about gloves, goggles and protective clothing.

On the tenth day of his employment, Sunday, about 2:45, "when we wound up with the spraying," Ronnie complained of feeling bad and Caldwell asked if he wanted to go to a doctor but Ronnie said " 'No,' he think he drank some water on an empty stomach" and so Caldwell took him home. His mother said that he got out of Caldwell's car about 4 o'clock and after he bathed and changed clothes was too sick to eat supper. His father first saw Ronnie at 4 o'clock in a few minutes he went to the back door vomiting, he came back in laid on the floor a few minutes went outside vomiting again and had an involuntary bowel movement. His father and mother bathed him again but "his head was hurting and he was sick to his stomach." His "eyes looked funny" and they drove him seventeen miles to East Prairie and he was ill again in the automobile and Dr. Weaver made arrangements for Ronnie to be admitted to the hospital in Sikeston. About 6:30 Ronnie was taken by ambulance to Sikeston and by then "white foamy stuff was rolling out of his nose and mouth" and he did not respond to his parents' talk. At 10:20 on June 21, 1964, Ronnie died, the death certificate reciting that death was caused by "chemical poisoning toxic corn spray."

In this background the appellants Choate and Larkins' liability to Ronnie, now to his parents, rests upon the most elemental of tort obligations, illustrated by Reickert v. Hammond Packing Co. (1909), 136 Mo.App. 565, 118 S.W. 525, an employee injured by caustic soda while cleaning his employer's iron meat trees, and Marsanick v. Luechtefeld, Mo.App., 157 S.W.2d 537. In the latter case the plaintiff suffered burns from

muriatic acid while cleaning his employer's brick walls. Against his employer plaintiff pleaded failure to warn and that he "was directed to wash said walls with a brush dipped into muriatic acid, without being furnished gloves or a mask, or other covering to protect his hands, arms, and face from being burned, when defendant knew, or by the exercise of ordinary care could have known, that in doing said work without such protection plaintiff was likely to be burned by said acid". Briefly as to the fundamental rules applicable here the court said, "an employer is bound to exercise reasonable precaution against injury to his servant while employed in his service. Not only must the master provide suitable and safe instruments and means with which the servant may carry on his work, but the master must warn the servant of all dangers to which he will be exposed in the course of the employment * * *." Peculiarly applicable here is the herbicide case of Holladay v. Chicago, B. & Q. R. Co., D.C., 255 F.Supp. 879, in which a switchman suffered peripheral neuritis from contact with sprayed weeds. The court pointed out that the railroad was not an insurer of the safety of its employees but was liable only for negligence which included foreseeable harm. See also for the general rules 53 A.L.R. 392 "Master's liability for injury to servant by disinfectant or similar substance," and 12 A.L.R.2d 436, injury upon spraying crop, and 74 A.L.R.2d 1029 "Master's liability for servant's condition or injury resulting in dermatitis," and Evinger v. Thompson, 364 Mo. 658, 265 S.W.2d 726.

■ The appellants do not directly challenge the applicability of these fundamentals; they contend that their motions for judgment should have been sustained because they say there was no evidence that their failure to furnish gloves, goggles, masks or protective clothing "directly caused or directly contributed to cause the death of Ronnie Earl Tripp." To precisely understand this general assignment it is necessary to turn to the argument section of

their brief where the subject is fully explored and expounded. They say that Dr. Sarno, the attending physician in Sikeston, said that Ronnie's symptoms were similar to sunstroke, that there was some doubt in his mind as to the nature of his illness and he could not say with medical certainty that gloves, goggles and protective clothing "would have prevented exposure" and most important "he could not say with reasonable medical certainty how the exposure came about in the case of Ronnie Earl Tripp." The point is repeated, "Respondent's only medical witness could not say with reasonable medical certainty how the exposure came about, therefore, Respondents failed to make a submissible case against Appellants." In support of their argument the appellants rely upon James v. Sunshine Biscuits, Inc., Mo., 402 S.W.2d 364, in which the employee died of food poisoning—food that she had bought outside the plant. The charge of negligence, which in itself distinguishes the cases, was failure "to obtain prompt medical attention for such employee." The circumstances need not be detailed here, the court concluded "it is apparent from the facts previously detailed that plaintiff failed to produce substantial medical evidence that delayed medical care caused or contributed to cause the death."

It was in anticipation of this particular assignment that the facts surrounding Ronnie's working conditions and the course of his illness were set forth in some detail. And without ponderous demonstration these circumstances unquestionably show Ronnie's exposure to the very dangerous and toxic chemical Parathion DDT. Dr. Sarno saw Ronnie wheeled into the hospital and he said, "When I first saw him, he was cyanotic or blue, couldn't breathe. He had a thick jelly-like mucus coming from his nose and from his mouth. His eyes were watering. He smelled as though his bowels had been moving and he had a diarrhea. He was unconscious, could not talk. His muscles were very rigid, and when you touched him, he just went into convulsions and spasms and his

muscles seemed to be twitching all over. Dr. Sarno's diagnosis was that "this boy had died of a chemical poisoning when I heard the history of the type of work he had been doing, and it was obviously a case of parathion poisoning, insecticide poisoning." On cross-examination the doctor said that Ronnie "had some of the symptoms" of sunstroke but he repeated the symptoms and again said "there is no doubt in my mind that this boy died of parathion poisoning." Rather than like death from sunstroke the doctor said that Ronnie's death was "very similar to a type of death like from taking strychnine or in World War I it is related to the type of gases that were used in World War I, particularly phosgene gas is an aniline and derivative of the same type of chemicals as parathion."

Dr. Sarno did say on cross-examination that he did not "know what caused his exposure, whether it was gloves. That would have been one portal of entry. Whether or not that was the portal of entry in his case, I could not say." He noted particular symptoms of parathion poisoning, "his eyes were very, very full of tears, watery substance similar to tears" but whether it was due to exposure of the eye mucous membrane to the parathion he could not say. He did say that if gloves or clothes were contaminated "He would be continually exposed." He said that the chemical had a "cumulative effect" meaning "it accumulates in the body" and "(i)t is very rapidly absorbed by the skin." As to how parathion enters the body, Dr. Sarno said, "It can enter in several ways. It can enter by contact with the skin, direct exposure of the skin or mucous membranes to the insecticide. It can enter by breathing it in. It can enter by swallowing it or getting it in your eye." Caldwell said that on occasion in handling the materials some parathion had gotten on him and when asked whether Ronnie had "occasion to do the same" replied "I imagine he did." Dr. Sarno said of Ronnie "His lungs were completely filled as though he had died from drowning. * * * That is very typ-ical of deaths from this cause." And while the doctor could not say "what type of exposure he had" he said, "Certainly he had some of the type(s) of exposure, if not all of them, but just which one, it would be difficult to say." And again he said, "this boy died of parathion poisoning" and the poison enters the body "through the tissues. * * * it had to be absorbed in one of those three ways. There is no other way."

La Plant v. E. I. Du Pont De Nemours & Co., Mo.App., 346 S.W.2d 231, was an action for damages for the death of plaintiff's cattle from eating willows sprayed with the defendant's brush killer Ammate X. One of Du Pont's three-part defenses was that its motions for directed verdicts should have been sustained "because the evidence was insufficient to permit a finding that any of plaintiff's cows ingested sufficient nitrates to cause death." The court carefully reviewed the entire record and concluded "No useful purpose could be served by our reviewing and repeating, sifting and sorting, elucidating and elaborating upon, the facts hereinbefore detailed. Suffice it to say that we are satitfied that, upon the record presented, the issue as to whether plaintiff's cows died of nitrate poisoning from eating the sprayed willow leaves was for the jury and may not be ruled as a matter of law." If upon the record in that case it was a fair and permissible inference that plaintiff's cows had ingested sufficient quantities of willow leaves and brush killer to result in their deaths, a fortiori the facts and circumstances detailed here support the inference and finding that Ronnie Tripp ingested lethal quantities of Parathion DDT either by inhalation or by absorption through the skin or the membranous tissues of the eyes or, as Dr. Sarno said, "if not all of them." See also Holladay v. Chicago, Burlington & Quincy R. Co., and Evinger v. Thompson, supra.

■ The appellants' other assignments of error relate to the damages and the

measure of damages instruction. It is urged that Instruction 4 upon the measure of damages for the death of a minor child (M.A.I. 5.03) is erroneous because, they say, it permitted the jury to consider "exemplary or punitive damages" which were "improper elements" and, further, did not "compute the parents' damages as the value of the child's services during minority less the expense of raising the child to maturity." In the argument portion of their brief it appears that the objection is to that part of the instruction submitting the "aggravating circumstances attending the wrongful act, neglect or default resulting in such death." RSMo 1959 Supp. § 537.090, V. A.M.S.; M.A.I. Inst. 5.93. From their citation of cases, particularly Boyd v. Missouri Pacific Ry. Co., 236 Mo. 54, 139 S.W. 561, it appears that the basis of their complaint is that there was no evidence warranting the submission of "aggravating circumstances." But referring specifically to appellant's assignment, while as the Boyd case says "aggravating circumstances" may not be submitted except in circumstances of "wilfulness, malice, wantonness, reckless, or conscious negligence or wrong intent" all the equivalent of permitting exemplary damages, there is in point of fact no reference in Instruction 4 to punitive or exemplary damages and there was no testimony on the subject. And there is no requirement in M.A.I. 5.03 that a specific formula be applied in computing the damages, the M.A.I. direction is "such sum as you believe will fairly and justly compensate them for the damages which you believe plaintiffs sustained, (and are reasonably certain to sustain in the future) as a direct result of the death of their child and which can reasonably be measured in money." In Richeson v. Hunziker, Mo., 349 S.W.2d 50, there were no eyewitnesses to the collision of motor vehicles other than the deceased and the defendant who did not testify, nevertheless, the court after examining the circumstances and reviewing all the rules under § 537.090 concluded that "the issue of aggravating circumstances was for the jury." In May v. Bradford, Mo., 369 S.W.2d 225, the court examined the circumstances of an automobile-truck collision resulting in the death of plaintiff's wife and concluded, 369 S.W.2d 229, "The jury could reasonably have found from the evidence that the conduct and acts of the defendant Bradford were reckless and wanton and in gross disregard of the rights and safety of the occupants of the Buick automobile and others on the highway. * * This and other evidence tended to show aggravating circumstances within the meaning of the statute and the court did not err in giving Instruction No. 2." It would serve no useful purpose to analyze certain of the circumstances detailed here and characterize the conduct of the parties, it is sufficient to say that if aggravating circumstances were a jury question in the Richeson and May cases it follows as a matter of course that this record likewise warrants their inclusion and submission.

The appellants' final point is that they "are entitled to a new trial because the verdict in the sum of $25,000.00 is so grossly excessive as to be conclusive evidence of the fact that it was the result of passion and prejudice on the part of the jury." The only authority cited in support of this assignment is § 537.090 which since 1955 (Laws of Mo. 1955, p. 778) permits the jury to award surviving parents not to exceed $25,000.00 "as the jury may deem fair and just for the death and loss thus occasioned, with reference to the necessary injury resulting from such · death" and, when supported, the attendant aggravating circumstances. It is surprising that this particular assignment of error would be repeatedly urged, under this statute, as well as in other instances and cases, this particular assignment is addressed, in the absence of manifest abuse of discretion, to the trial court. "The trial court was entitled to weigh the evidence and infer bias and prejudice from the size of the verdict alone." Hartz v. Heimos, Mo., 352 S.W.2d 596, 604; Brewer v. Rowe (en banc), 363 Mo. 592,

252 S.W.2d 372, 376. The fact that a verdict is very large, even excessive, does not in and of itself demonstrate passion and prejudice, and it is the established practice in this jurisdiction to cure the error of excessive verdicts by enforced remittiturs. Joice v. Missouri-K.-T. Railroad Co., 354 Mo. 439, 453, 189 S.W.2d 568, 576, 161 A. L.R. 383.

Cornell Tripp, age 42, is a part-time day laborer and sharecropper in twenty acres of cotton and in addition to his wife and Ronnie has six children. Ronnie, age 16 and in his first year of high school, had "worked out" other summers, the defendants were paying him $75.00 a week and Mrs. Tripp said that he always brought his money home and gave it to her and she "would keep it to help buy groceries and buy school clothes for him and the other six kids." And here as in Brewer v. Rowe, 'supra, in which maximum recovery was permitted for the death of a boy eleven years old, and in Hartz v. Heimos, involving a daughter eighteen, also awarded the maximum, it may not be said that this verdict is manifestly excessive and therefore subject to remittitur in some definite amount. "There can be no substantial evidence as to the probable net value of his future service to his parents. In such a case, we deem it to be the expressed intent of the Legislature that the jury, not the trial or appellate court, fix the amount of the award 'as they may deem fair and just.' And too we think the jury is more able and likely to arrive at a fair and just award than the reviewing court. This, for the reason that the jury in most cases sees the parents and learns something of their station in life and the surrounding circumstances under which the child lived and was being reared." (252 S.W.2d l. c. 377).

For the reasons indicated the judgment is affirmed.

STOCKARD and PRITCHARD, CC., 'concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

EAGER and DONNELLY, JJ., FINCH, P. J., and STUBBS, Special Judge, concur.