Frank MUDD and Velma Mudd, Respondents,

v.

Ambrose QUINN and Rudolph H. Buckner, Appellants.

No. 55150.

Supreme Court of Missouri, Division No. 1.

Feb. 8, 1971.

Branham Rendlen, Hannibal, Bollow, Crist & Bollow, Shelbina, for respondents.

G. B. Veatch, Monroe City and Zenge & Smith, Canton, for appellants; Eugene E. Andereck, Trenton, of counsel.

HIGGINS, Commissioner.

Action by surviving parents for $50,000 damages for wrongful death of minor child; plaintiffs had verdict and judgment for $30,000.

Dorothea Sue Mudd, unmarried daughter of plaintiffs Frank and Velma Mudd, was born July 24, 1950; she died March 12, 1968, as a result of a collision between a Volkswagen automobile, in which she was a passenger, and a tractor-trailer unit owned by defendant Ambrose Quinn and operated by defendant Rudolph H. Buckner.

At about 9:45 p. m., March 12, 1968, the tractor-trailer unit, weighing about twelve to thirteen tons, loaded with some 30,000 pounds of hogs, was being operated eastwardly on U. S. Highway 36 at its intersection with U.S. Highway 61, in Hannibal, Missouri. Upon arrival at the intersection, the tractor-trailer proceeded eastwardly from Highway 36 along the ramp connecting it to Highway 61 in order to proceed southwardly on Highway 61. The Volkswagen was being driven southwardly on Highway 61 by Carla Sue Heiser. The two vehicles came into collision when the tractor-trailer unit, instead of stopping at the entrance to Highway 61, proceeded across Highway 61, blocking the path of the Volkswagen. Plaintiffs charged humanitarian negligence and also that the tractor-trailer was not equipped with two sets of brakes in good order; that it failed to stop at the entrance to Highway 61; that it failed to yield to Miss Heiser; that it failed to observe the stop sign at the entrance to Highway 61; that it was not operated in a careful and prudent manner; that it was operated at a high, excessive, and dangerous speed.

At the outset of trial, plaintiffs dismissed without prejudice against the defendant administratrix of Carla Sue Heiser. Defend-

ants Quinn and Buckner admitted negligence and that the death of Sue Mudd resulted from such negligence, "so that the case can then be tried strictly on the question of the amount of the verdict."

At the conclusion of the evidence the court among its instructions gave:

## "INSTRUCTION NO. 3

"You must award plaintiffs such sum as you believe will fairly and justly compensate them for the damages which you believe plaintiffs sustained and are reasonably certain to sustain in the future as a direct result of the death of their child and which can reasonably be measured in money.

"You must not consider grief suffered by plaintiffs.

"In assessing the damages you may take into consideration any aggravating circumstances attendant upon the fatal injury. M.A.I. 5.03.

## "INSTRUCTION NO. 4

"In assessing damages you may take into consideration any mitigating circumstances attendant upon the fatal injury. M.A.I. 6.01 Modified."

At the same time the court, upon request of defendants, refused:

## "INSTRUCTION NO. A

"Your verdict for the Plaintiff shall award them such sum as you believe will fairly and justly compensate them for the damages which you believe Plaintiffs sustained as a direct result of the death of their child and which can reasonably be measured in money.

"In determining the damages to Plaintiff, you may consider only the funeral expense incurred by Plaintiffs, and ambulance service, and the value of the child's services during her minority, from which items you must deduct such sums as you find to be the reasonable costs

of the child's support maintenance during said period, including her board, lodging, clothing and other necessary expenses, if any. You cannot award the Plaintiffs any damages for mental anguish or sorrow, or loss of society or companionship.

"In assessing damages you may take into consideration any aggravating or mitigating circumstances attendant upon the fatal injury. M.A.I. 5.03 Modified."

Appellants contend the court erred in giving Instruction No. 3 "because it does not correctly state the measure of damages for the death of a minor." The argument is that the instruction is erroneous in that "it does not correctly state the substantive law" to the effect that a parent can recover in the death of a minor child the pecuniary loss from the date of death until the child would have attained its majority reduced by cost of care during such time. See Smyth v. Hertz Driv-Ur-Self Stations, Inc., Mo.App., 93 S.W.2d 56, 60–61; Hornbuckle v. McCarty, 295 Mo. 162, 243 S.W. 327, 330; Oliver v. Morgan, Mo., 73 S.W.2d 993, 996–997. In further argument they assert that the instruction does not meet the tests of "Is it a correct statement of law?" and "Is it a complete statement?" See 1963 Report to Missouri Supreme Court, MAI, Second Edition, page xxiii. Appellants then conclude that the proper instruction to have been given was their refused No. A, and that by it the jury would have had a proper formula for its guidance.

■ The difficulty with appellants' position lies in their own recognition that Instruction No. 3 is MAI 5.03 for submission of damages due to the death of a minor child. Under Brown v. St. Louis Public Service Co., Mo., 421 S.W.2d 255, 257, when an MAI instruction is applicable, its use is mandatory. The trial judge had no alternative but to give MAI 5.03 and to refuse defendants' No. A; the judge was obliged to follow this court's current directions and he may not be convicted of error in so doing. State ex rel. State Highway Commis-

sion v. DeLisle, Mo. 1971, 462 S.W.2d 641.

The Committee's Comment to MAI 5.03 recognizes the substantive law in prior child death cases and chose to recommend, and the Supreme Court adopted, "the broad pecuniary loss standard." The committee commented also that "During the instruction conference the parties and the Court should discuss (on the record) just what damages are supported by the evidence and can properly be argued to the jury. In this way jury arguments can proceed without undue interruptions." The record shows the objection of counsel to instructions but does not disclose such a discussion of the supported items of damage; however, as will be demonstrated, the defendants (supported by the court) did argue the matters contained in their Instruction No. A with respect to reducing pecuniary loss by cost of support.

■ Appellants complain also with respect to Instruction No. 3 that there was no evidence to support the submission of aggravating circumstances. Their argument is that submissible aggravation is shown only by unreasonable speed, passing in face of danger, intoxication, anger, or "something to indicate a wilful and wanton disregard for safety."

Much of the record is devoted to adducing evidence to show aggravating circumstances. Except for a period between 3:00 and 4:45 p. m., on the date of the casualty, Mr. Buckner had been on duty with Mr. Quinn's rig for fifteen hours. He had driven from Monroe City, Missouri, to Ottumwa, Iowa, earlier in the day with a load of cattle. Upon his return, he drove to Monticello, Missouri, for part of the load of hogs, returned to Monroe City for the remainder of the load, and proceeded to St. Louis via Highways 36 and 61. As he approached the intersection of Highways 36 and 61, he downshifted to third gear to slow his rig. When he approached the ramp from Highway 36 to Highway 61, he shifted from third to fourth gear as he pro-

ceeded in the ramp, thus permitting his rig to gain speed. He was familiar with the ramp, its traffic and traffic controls; however, he did not stop, flash lights, sound horn, or attempt an application of his emergency brake. When he found he could not stop, he proceeded across the highway, completely blocking it. Mr. Quinn had no schedule for inspection and maintenance of brakes on his rig and did not know when they were last adjusted. Mr. Buckner had never had the brakes checked during his employment by Mr. Quinn. The rear brakes on the tractor were shown to be inadequate in that the brake drums were rusty and the brake shoes were not contacting the drums upon application of the brakes. There was no braking effect on the left rear wheel and the right wheel had little or no braking effect. With the wheels off the ground, engine running and air pressure built up, both rear wheels could be turned by hand with the brakes fully applied. The rear brakes on the trailer were similarly shown to be inadequate. The right rear wheel could be turned by hand with the brakes fully extended; the left rear wheel could be turned manually by two men with the brakes fully extended. In the opinion of the experts who made the examinations, the brakes had been out of adjustment and not working for some time. Mr. Quinn's mechanic assisted in the inspection and he had not adjusted the brakes.

Richeson v. Hunziker, Mo., 349 S.W.2d 50, 53–55 [3], after stating the rule governing submissibility of aggravating circumstances, then detailed circumstantial evidence, in absence of eyewitness testimony, showing speed and resulting skidding into plaintiff, and concluded that the issue of aggravating circumstance was one for the jury. Similarly, May v. Bradford, Mo., 369 S.W.2d 225, 229 [9–11], found the issue of aggravating circumstances to be for the jury where the driver of a 9,000 pound truck with a 24,000-pound load attempted to pass on an upgrade curve in the face of an oncoming automobile some 1,800

to 2,000 feet away. Tripp v. Choate, Mo., 415 S.W.2d 808, 813 [2], affirmed submission of aggravating circumstances where the minor's death occurred as a result of poisoning while using a corn spray with a poisonous chemical on his employer's farm. As stated in that case, "if aggravating circumstances were a jury question in the Richeson and May cases (and now in the Tripp case itself) it follows as a matter of course that this record (operation by a tired driver of heavy equipment with brakes shown to have been inadequate for considerable time prior to the casualty) likewise warrants their inclusion and submission." Note also that Instruction No. A, which appellants contend should have been given, would have submitted aggravating circumstances.

Appellants contend that the trial court should have granted a new trial "because the verdict was so grossly excessive as to shock the conscience of the Court and to show it resulted from bias and prejudice of the Jury"; and they assert that if such situation exists with respect to the verdict, "it should be set aside." Their argument is that this is the highest verdict they could find for death of a minor in Missouri and that "it would seem impossible to justify" it as a pecuniary loss during minority reduced by cost of maintenance to majority. Neither by this argument nor in their motion for new trial have appellants presented any suggestion or request for relief by remittitur.

■ Several of the principles governing the review of verdicts under a charge of excessiveness as a result of alleged bias and prejudice are collected in Wolfe v. Harms, Mo., 413 S.W.2d 204, 217 [25–27]. When a verdict is alleged to be excessive and cannot be supported by evidence and injuries sustained, the only reasonable hypothesis is prejudice or willful disregard of instructions. The assessment of damages is peculiarly the function of the jury and a verdict should not be interfered with absent an exercise of extreme caution because the appellate court does not pass on the weight of the evidence in a jury case and, for that reason, an appellate court will not determine bias and prejudice of the jury on amount of the verdict alone. Each case must be considered on its own facts, and consideration is given to the nature and extent of the loss, changing economic factors, and compensation awarded and approved in similar cases. Due regard should be given to the purchasing power of the dollar, to the rule of reasonable uniformity of awards in comparable cases; that the jury and trial judge were in a better position than the reviewing court to measure an award of reasonable compensation, and that the trial court has approved the verdict in issue. See also Smyth v. Hertz Driv-Ur-Self, supra, 93 S.W.2d l. c. 60–61 [7–9].

■ When measured by these criteria, it does not appear that the verdict was a product of jury misconduct or that it is so manifestly excessive as to suggest interference in some amount by this court.

The presence in this case of aggravating circumstances and the propriety of the submission have already been demonstrated. In addition, the evidence shows that Sue Mudd, age 17 years, 8 months, at her death, was a senior in Hannibal High School, intending to attend college following her graduation. She was a conscientious student ranking in the upper thirty-seven percent of her class and attentive to school regulations. She was active in school activities, and was physically attractive to the point she was nominated as a queen candidate on several occasions. She had a job at a jewelry store under a program where she attended school in the morning and worked in the afternoon five days a week. She also worked from 6:00 to 9:00 p. m. on Fridays and from 9:00 a. m. to 5:00 p. m. on Saturdays. She had a pleasing personality, was friendly to customers, was anxious to help, was respectful, and learned quickly. She earned $941.50 from her work in the period May to December, 1967, and had earned $264.50 in 1968 prior to her

death March 12. She used the money to purchase school lunches, her clothing, and for other personal needs. In addition to her school and work, Sue was helpful around her home, keeping her own quarters, helping her mother with meals, sewed, knitted, did housework, yard work, and helped maintain her parents' premises and automobile. She was in good health. There was an ambulance charge of $15 and Sue's funeral expenses totaled $1,379.94.

Tripp v. Choate, supra, was a 1967 review of damages for a wrongful death occurring in June, 1964. The victim was a 16-year-old part-time day laborer and sharecropper, and his parents were awarded $25,-000, the then maximum amount authorized by Section 537.090, V.A.M.S., which, as it applies to this case, authorizes a maximum of $50,000. In its review the court noted that the statute authorized an award not to exceed the maximum amount, " 'as the jury may deem fair and just for the death and loss thus occasioned, with reference to the necessary injury resulting from such death' " and, when supported, the attendant aggravating circumstances. The court observed, appropriate to the present case, "It is surprising that this particular assignment of error would be repeatedly urged, under this statute, as well as in other instances and cases, this particular assignment is addressed, in the absence of manifest abuse of discretion, to the trial court." 415 S.W.2d l. c. 813 [3]. Similarly, Hartz v. Heimos, Mo., 352 S.W.2d 596, in 1962, approved a maximum award to the parents of an 18-year-old daughter killed in November, 1959, and Brewer v. Rowe, 363 Mo. 592, 252 S.W.2d 372, in 1952, approved a maximum award for the death of an 11-year-old boy killed in June, 1950. In the last case it was observed, again appropriate to this case, that "There can be no substantial evidence as to the probable net value of his future service to his parents. In such a case, we deem it to be the expressed intent of the Legislature that the jury, not the trial or appellate court, fix the amount of the award 'as they may deem fair and

just.' And, too, we think the jury is more able and likely to arrive at a fair and just award than the reviewing court. This, for the reason that the jury in most cases sees the parents and learns something of their station in life and the surrounding circumstances under which the child lived and was being reared." 252 S.W.2d l. c. 377 [8].

Appellants' remaining point alleges trial errors occurred with respect to remarks of counsel and admission of evidence, particularly a colored photograph.

The first such instance came during the testimony of Donald Pickett, a Hannibal police officer. He was presented by plaintiffs to depict the scene of the collision, to establish he was in charge at the scene, to give measurements and observations he had made with respect to the intersection. During his examination he was asked: "Q Did you see three girls lying on the surface of the ground—." Defendants objected and moved for mistrial on the ground the question was asked for the purpose of inflaming the jury. The court instructed plaintiffs not to put anything in about the location of the girls but refused to declare a mistrial. Appellants assign error to such refusal and the argument appears to be that the question injected three deaths into a single death case.

■ Three girls lying on the ground is not the same as three dead girls lying on the ground and, accordingly, the denial of mistrial was well within the trial court's discretion in such matters.

The colored photograph in question was that of the victim, Sue Mudd. It was passed and displayed to the jury and referred to in plaintiffs' argument. Defendants' objections in both instances were overruled and the error assigned is that the picture had no probative value "because the law does not say that an attractive girl's death is of any greater loss to her parents than one who is not physically attractive."

The photograph was relevant in depicting the condition of health of deceased and, if it showed her to be attractive, such could affect her earning power; and admissibility of photographs in death cases for such purposes has been ruled in other jurisdictions. See, e. g., Trammell v. Matthews, 86 Ga.App. 661, 72 S.E.2d 132; Davis v. Seaboard Air Line Ry., 136 N.C. 115, 48 S.E. 591; Drinon v. Wilson, 2 Cir., 113 F.2d 654; Amedeo v. Grand Rapids & I. R. Co., 215 Mich. 37, 183 N.W. 929. Faught v. Washam, Mo., 329 S.W.2d 588, did not hold colored photographs inadmissible *per se*; and Gathright v. Pendegraft, Mo., 433 S.W.2d 299, 307, approved use of a colored photograph to show scars as bearing on physical condition. Under such authorities the trial court's rulings with respect to the photograph were not an abuse of discretion. See Shepard v. Harris, Mo., 329 S.W.2d 1, 12.

The final assertion under this point is that an incident or series of incidents during arguments gave the jury an impression "that Appellants' counsel had deliberately tried to mislead them as to what the law was and that Instruction No. 3 was what they were bound to follow, even though it was incorrect as we have pointed out. It amounted to an unfair advantage for the Respondents."

The absence of error in the giving of Instruction No. 3 in this case has already been determined adversely to appellants and contrary to the foregoing assertion; and resolution of the remainder of this argument is aided by some quotation of the referenced closing arguments:

"MR. BOLLOW (plaintiffs' counsel): * * * You saw the girl's picture, you saw it, a beautiful girl. A daughter that any one of us would be proud of, Gentlemen. I don't know what impression you got but I got the impression from listening to Mr. Zenge's cross-examination of her parents yesterday that he thought the damages ought to be cut down because she used her money to buy her clothes with instead of turning it over to her parents, because she was a cheer leader and she took time out and wasn't at home to help her mother with the dishes; because she worked and wasn't at home to help her mother with the dishes. I don't know what impression you got. The impression I got from that cross-examination was that that was the reason for cutting down the damages. How many people in this courtroom, how many men ever took and rammed into their own pockets the money their child had made? The Court will tell you what the measure of damages are. What are they, Gentlemen? How do you value human life? I can't tell you. There isn't any yardstick by which you can pin it down. That's up to you. Here, we had seventeen years of love, affection, work, grief, frustration—

"MR. ZENGE: If the Court please, we object to this. This is not an element of damage, he mentions the word 'grief,' and it has been specifically instructed this is wrong. THE COURT: Sustained as to that. MR. ZENGE: I ask that the jury be instructed to disregard that, may we please? THE COURT: Yes, the jury will disregard that statement in reference to grief.

"MR. BOLLOW: Seventeen years, they had raised this girl, seventeen years, they had brought her up from childhood.

"MR. ZENGE: If the Court please, we object to this, this is prejudicial argument, and it is not an element of damage. THE COURT: Well, overruled.

"Mr. Bollow concluded his argument without further objection being made, and at the close of which, Mr. Zenge, one of the attorneys for the defendants, made his closing argument, a portion of which is as follows:

"MR. ZENGE: * * * It might be said that Zenge came in here and said they were liable just because he couldn't have done anything else. The heck he couldn't have done something else. Zenge could have sat and let them prove their case. But certainly, I couldn't sincerely sit here

and deny these things when I was convinced from the evidence that my people were wrong, wrong because they failed to stop at a stop sign irrespective of what the reason for it was, and it would be the grossest kind of ignorance and insincerity for me to do otherwise than to come in here and admit we were wrong. But goodness, we certainly have a right to ask that you apply the law of damages as it was written by the Legislature and not be fanned into an impassioned position by the statements of somebody that wants an unreasonable verdict. * * * Now what does the law say the measure of damage is? The law says that during a minor's minority, that is, until the child reaches the age of twenty-one, the parents are entitled to the child's wages unless she is emanicipated, or married, or self-supporting, which are not elements in this case, so in the first place we have limited span in which to calculate the time when they can calculate a loss. Actually, in this case about three years and three months, or a little more than that, because this young lady would have been eighteen on the 24th day of July, 1968, and she passed away on the 12th of March, so just a little over three years and three months is the period of time which you must calculate the loss that has been sustained by these folks. Now then, what is the ruling, then, under the law with reference to what the measure of damages is? It's the monetary loss. It's the loss in dollars and cents that this mother and father have sustained less the cost of furnishing clothing, room, board, education, and the necessities of life, if there be others, plus the funeral expenses, which, in this case, is admitted to be $1395.-94. Now, this seems coldblooded, and I grant you it does seem coldblooded, but you will remember when we were interrogating you as to whether or not you would serve on this jury, you would follow the law with reference to damages, and if the measure of damages as provided by Statute was different than you thought it should be, you would take the law rather than use your own judgment in the matter, or substitute your feelings about it. I don't like what the law says about the way the measure of damages is calculated, either, but I'm just like you, I have to abide by the law until such time as the Legislature sees fit to change it. Now it is true the Statute says that in a death claim there is a limit of $50,000.00, but the law does not say that every time somebody loses a life, somebody else can collect $50,000. Let me show you, here is a married man, we will say * * *. You may rest assured that if I wasn't correctly stating the law there would be objections made by counsel for the plaintiffs which would be sustained by his Honor, the Court, so you must know I'm telling the truth about the way you measure the damages. * * *

"Mr. Zenge concluded his argument, after which Mr. Branham Rendlen made the closing argument on behalf of the plaintiffs, and the following occurred during his argument:

"Mr. Zenge has discussed something that he understands the law to be, and I'm not going to quarrel with Mr. Zenge's understanding. He has a right to understand the law any way he wants to, but I direct your attention, in consideration of what the law is with respect to what you are to do in assessing damages, to an instruction which the Court has given you, and which you will determine to be the law in the case, not what Mr. Zenge understands the law to be, or what Branham Rendlen understands the law to be, but this is the law which you will follow. Now, what does it say? 'You must award plaintiffs such sum as you believe will fairly and justly compensate them for the damages which you believe plaintiffs sustained and are reasonably certain to sustain in the future as a direct result of the death of their child and which can reasonably be measured in money. You must not consider grief suffered by plaintiffs. In assessing the damages you may take into consideration any aggravating circumstances attendant upon the fatal injury.' Now, that's the law that you are

going to go by—not by what Mr. Zenge understands the law to be. Now,—

"MR. ZENGE: If the court please, I object to that argument. That implies that I've misled this jury and counsel knows I haven't misled them about the law, and I think that's improper and the jury are entitled to know that it is improper, and I object to it. THE COURT: Well, the M. A.I. instructions have gotten us into this situation. Judge Rendlen is quoting the instruction, and yet what has been said with reference to the measure of damages by Mr. Zenge follows the Missouri law also.

"MR. RENDLEN: The Court has not instructed you on anything except what appears right here. That's what you are to go by under your oath.

"Mr. Rendlen concluded his argument without further objection.

" * * * MR. ZENGE: I want to make a motion for a mistrial because of the argument made by counsel in closing. I think it left the impression that I was not stating the law, and immediately following the Court's statement that I had correctly stated the law, he followed with the statement to the effect that the Court gave them the instructions of what the law was and the Court had instructed them only in reference to what he had said. I submit this is highly prejudicial and we have no way of protecting ourselves and answering it, and the whole tenor of the case gets completely out of bounds, and it appeals to the prejudice and passion of the jury and causes them to believe that counsel has misrepresented the law to them when presenting the case for the defense, and we ask that a mistrial be declared in order to protect the rights of these defendants.

"THE COURT: The motion to declare a mistrial is denied."

The foregoing shows that not only did plaintiffs argue their damages under Instruction No. 3, it shows also that defendants were permitted to argue their

view of the substantive law of damages in death of minor cases and, in such respects, were supported by the trial court's remarks as to both the substantive law and criticism of the required MAI instruction. As a consequence, appellants' argument of "unfair advantage" falls, and the broad discretionary powers of the trial court in control of arguments may not be said to have been abused on this record.

Judgment affirmed.

HOUSER, and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.