Daniel G. McKINLEY and Clara E.
McKinley, Respondents,

v.

J. L. VIZE, Jr., D. D. S., Appellant.

No. 38185.

Missouri Court of Appeals,
St. Louis District,
Division Four.

Feb. 21, 1978.

George E. Lee, Doris J. Banta, Barnard & Bear, St. Louis, for appellant.

Robert Lee Smith, Thurman, Nixon, Smith, Howald, Weber & Bowles, Hillsboro, for respondents.

ALDEN A. STOCKARD, Special Judge.

Daniel G. McKinley, Jr., eighteen years of age, died on July 29, 1970, in an operating room at Rockwood Hospital in St. Louis County immediately following the extraction of two wisdom teeth. This action for wrongful death was brought by his parents against the dentist, the nurse-anesthetist and the operator of the hospital. Settlements were effected during trial with the hospital operator and the nurse-anesthetist. The trial proceeded against the dentist alone and resulted in a verdict for plaintiffs in the amount of $28,000. The defendant dentist has appealed. We affirm.

Daniel had been a regular patient of appellant since 1963. On July 13, 1970, appellant took x-rays and discovered that Daniel had two impacted wisdom teeth, which in his opinion should be removed, and arrangements were made to have that done at the Rockwood Hospital.

Daniel had a history of asthma in his childhood and some allergic symptoms continued. Appellant testified that he did not know Daniel had asthma, but his mother testified that when she first took him to appellant in 1963 she "told him then that [he] had childhood asthma," and that on a later occasion when appellant extracted some teeth for Daniel she "reminded him again that [he] had asthma."

Dr. Ecker, Daniel's personal physician, examined him prior to the dental surgery because the hospital required a pre-operative physical examination. In a letter to appellant Dr. Ecker stated that Daniel was in good health." No mention was made of any allergy or asthma problem. The record of Dr. Ecker's examination contained the entry "no asthmatic breathing." However, Dr. Ecker testified by deposition that in 1963 Daniel "definitely [had] asthma" and that he treated him for asthma in 1966 and again in 1967.

Daniel was admitted to Rockwood Hospital on July 28, 1970. Blood and urine tests were performed and a history was taken by the house doctor. An entry made at that time on what was referred to as "Progress

Notes" showed "history of childhood asthma," but apparently this was not a part of Daniel's medical chart and neither the anesthetist nor appellant saw this entry prior to the surgery.

The anesthetist talked to Daniel when he was brought to the operating room. She asked if he was allergic to anything, if he had been taking medicine before coming to the hospital, and if he had any heart problems. When she first saw him Daniel was lying on a stretcher. He seemed calm, but was breathing rapidly. She testified that his blood pressure was elevated somewhat, but not significantly. She observed nothing which would cause her to suggest that the operation be called off.

The anesthetist also testified that she considered using Innovar or Flourtheine as the main anesthetic agent, and that she decided to use Innovar. She further testified that the "narcotic portion" of Innovar acts as a "bronchial constrictor somewhat," while Flourtheine "dilates the bronchials," and that if a person has a history of asthma "Flourtheine would be the drug of choice" to use. She further stated that she did not know that Daniel had a history of asthma, that appellant did not advise her that he had any such condition, and that if she had known he had asthma she would have used Flourtheine.

The extraction went smoothly and both wisdom teeth were removed. The anesthetist testified that she monitored Daniel's pulse and blood pressure throughout the procedure and they remained normal. Appellant told the anesthetist that he was finished. He then removed some throat packing, washed up at the sink, took the chart and walked to a table outside the room and began to write on the chart. He immediately returned to the operating room when he heard something said about Daniel not looking good. The anesthetist said she could not get a pulse, and appellant sent his assistant for a doctor. Two doctors came in and administered some drugs and applied external cardiac massage, but without success.

It is not disputed that the immediate cause of Daniel's death was cardiac arrest. Plaintiff called as a witness Dr. Barnett A. Green, a medical doctor, who, after being qualified as an expert and a specialist in the field of anesthesiology, was permitted to testify that in his opinion the cause of the cardiac arrest was "lack of sufficient oxygen," a condition known as hypoxia, and that the cause of the hypoxia was "inadequate dilation of the lungs" so that "when the blood left the lungs and started to circulate out of the lungs to the rest of the body it was carrying too little oxygen." He was also permitted to testify that in his opinion Daniel's lungs could not adequately ventilate or expand to deliver the oxygen through the respiratory tract because "bronchial spasm undoubtedly was present restricting the amount of oxygen going into this patient," and that the bronchial spasm was the result of a "combination of * * [Daniel's] asthmatic reactivity and * * * the Innovar to which he was exposed which is a stimulus to bronchi spasm * * *."

Appellant asserts that the trial court erred in permitting Dr. Green to give an opinion "as to the cause of [Daniel's] death because there was insufficient evidence to support his opinion and his opinion was plainly founded upon speculation." Before examining this contention we should set forth the basic theory which permits the admission into evidence of an opinion of an expert witness.

As an exception to the general rule that a witness may not express an opinion, an expert witness may do so when qualified as such and when the subject matter of the opinion is not of common knowledge so that the opinion of an expert witness would be helpful to the jury in the determination of the issues before it. *Schears v. Missouri Pacific Railroad Company,* 355 S.W.2d 314, 321 (Mo. banc 1962). Such opinion must be based on facts established by competent evidence, *Craddock v. Greenberg Mercantile, Inc.,* 297 S.W.2d 541 (Mo.1957), and when the expert witness does not have personal knowledge of those facts, that is, the evidence of those facts was not established by the testimony of the

expert witness, the witness must be asked by use of the hypothetical question to assume the truth of the facts, particularly when disputed. *Hyman v. Great Atlantic & Pacific Tea Co.*, 359 Mo. 1097, 225 S.W.2d 734 (1949).

■ Dr. Green was submitted a hypothetical question in which he was asked to assume, among other things, that Daniel was 18 years of age and had a history of asthma as a child and that he later displayed symptoms when excited or frightened of rapid breathing, gasping and sometimes wheezing, but that he was otherwise in good health; that x-rays disclosed he had two impacted wisdom teeth which appellant advised to have removed by surgery under general anesthesia; that Daniel was admitted to Rockwood Hospital on July 28, 1970, and the next morning was given 2cc of Innovar; that no one who participated in the surgery visited him in his room before he was taken to surgery; that he was frightened and was having labored breathing; that an anesthetic procedure was performed "as shown by the chart" (which was in evidence); and that "during this anesthetic procedure a cardiac arrest occurred and that drugs were administered as shown on that chart." The doctor was then asked: "considering these things, can you say with a reasonable degree of medical certainty what was the cause of [Daniel's] cardiac arrest." Dr. Green answered that he could, and that the cause was "Lack of sufficient oxygen to enable the heart to function as a pump." Then based upon the same hypotheses the doctor expressed the additional opinions we have previously set forth.

In the argument portion of his brief appellant states that Dr. Green expressed the opinion that the cardiac arrest was caused by lack of oxygen, that the cause of the lack of oxygen was inadequate dilation of his lungs, and that the lungs did not adequately dilate or ventilate because of bronchial spasm. Appellant argues that Dr. Green "made it quite plain" that he based his opinion that Daniel's bronchi was in spasm or contracted upon the fact that the "anesthetist gave Anectine in a dosage that he considered excessive and that he assumed that the reason for this Anectine dosage was that the anesthetist was 'trying to get oxygen in and she couldn't.'" He then argues that there was no evidence to support the assumption "that the anesthetist was trying to get oxygen and couldn't or the assumption that she gave additional Anectine toward the end of the procedure because she was having a problem delivering oxygen" to Daniel. A summary of other testimony of Dr. Green on the cause of the cardiac arrest will be helpful.

Dr. Green first expressed the opinion that Daniel had what he called Grade I asthma. He described this as being "mild," and he based his opinion on Daniel's history of asthma and labored breathing, sometimes with wheezing when excited. He then stated that at the time of the surgery the fact that his blood test showed eosinophil 8 (which he said was "grossly abnormal" and is found in people who are allergic), that he was "extremely frightened" as shown on the anesthetic chart, that his breathing was labored, as testified to by his mother, and that his blood pressure was high and his pulse was fast, as revealed by the chart, indicated to him that "an allergic state was still going on." The doctor testified that the administration of Innovar caused a constrictive action upon the bronchial tubes, and because of this the lungs "could not adequately inventilate or expand to deliver oxygen throughout the respiratory tract where the bronchial spasm undoubtedly was present restricting the amount of oxygen going into this patient." The doctor was asked how the bronchial spasm would prevent enough oxygen from getting into Daniel's blood, and he answered: "If these passages are narrowed it requires greater force and greater volume to try and deliver the required amount of oxygen to these passages * * *." The doctor had previously referred to the anesthetic chart where it was shown that the anesthetist had, according to his interpretation, "continued the Anectine (a muscle paralyzing drug) apparently right up to the very end." Dr. Green interpreted the procedure as shown by the chart as an "indication he [Daniel] was hav-

ing a problem trying to get the oxygen and she [the anesthetist] was using the muscle paralyzing drug in very large doses for longer periods of time and then she was trying to get oxygen in and she couldn't."

Dr. Green as a qualified expert, could properly draw his conclusions from what was shown by the chart, which included the notation that administration of Anectine was continued past the end of the surgery, or as Dr. Green said, "to the very end," and a notation which meant that "the patient's color was blue." After Dr. Green testified as to the purpose of the use of Anectine, the effect of Innovar on the bronchi of a person with asthma, and then took into consideration what was shown by the anesthetist's chart, he clearly was authorized to conclude from these facts that the anesthetist was trying to get oxygen into the lungs of Daniel but that she could not, or at least could not get enough oxygen to the lungs. We find no merit to appellant's contention that there was "insufficient evidence" to support the opinion of Dr. Green or that it was "founded upon speculation."

Appellant next asserts that "if Dr. Green's [opinion] testimony was supported by competent evidence," the trial court erred "in allowing him to answer the final hypothetical question" because the question was framed "to state the very issue which was submitted to the jury by plaintiff's verdict directing instruction."

The question was as follows: "Do you have an opinion as to whether or not the actions of [appellant] in not telling the nurse-anesthetist of the asthma, assuming that he knew of it, and did not postpone the operation under the circumstances we are talking about here, directly contributed to cause the death of Danny McKinley?" Dr. Green answered as follows: "By failure of [appellant] to postponing or cancelling [sic] this operation because of the knowledge of asthma, he enabled the start of a whole series of events which led to the use of an agent which is harmful to an asthmatic patient, which in turn led to this difficulty in breathing, which in turn led to the lack of oxygen, which in turn lead [sic] to dam-

age to the brain and cardiac arrest. So that, in a chain, he started it."

 An expert opinion expressed by one properly qualified and based upon sufficient means of knowledge is evidence. The *province* of the jury is to hear all the evidence, including opinion evidence, to weigh it all, and to decide the issues. Thus an opinion, which is evidence, cannot invade the province of a jury in a strict sense, and this is so "even though the opinion is upon the very issue to be decided," and for that reason "an objection that an expert opinion invades the province of the jury is not a valid one." *Eickmann v. St. Louis Public Service Co.,* 363 Mo. 651, 253 S.W.2d 122, 130 (1952). See also *Cole v. Uhlmann Grain Co.,* 340 Mo. 277, 100 S.W.2d 311, 322 (1937), and *State v. Paglino,* 319 S.W.2d 613, 623 (Mo.1958). The only objection to the above opinion now relied on was that "it invades the province of the jury."

 Aside from the insufficiency of the objection, every expert opinion to a certain extent "invades" the province of the jury in the sense that it constitutes a conclusion gathered from the facts, but as stated in *State v. Cochran,* 356 Mo. 778, 203 S.W.2d 707, 713 (banc 1947) " 'An expert witness, in a manner, discharges the functions of a juror' because, in matters in which intelligent conclusions cannot be drawn from the facts by inexperienced persons, experts, 'who, by experience, observation, or knowledge, are peculiarly qualified to draw conclusions from such facts, are, for the purpose of aiding the jury, permitted to give their opinion.' " Clearly, the normal or expected result of the acts of appellant, as described in the evidence, is not a matter of common knowledge among untrained persons who comprise a jury, and the issue of causation is an issue upon which the jury could benefit from the opinion of an expert.

Appellant cites only *Gillmore v. Atwell,* 283 S.W.2d 636 (Mo.1955) and *Phillips v. Shaw,* 381 S.W.2d 768 (Mo.1964). Neither case is controlling. In the *Gillmore* case, as stated in *Martin v. O'Connor,* 406 S.W.2d 41 (Mo.1966), "improper questions were asked calling for the opinion of the witness on a

question of law," and in the *Phillips* case the question pertained to a matter which was of such common knowledge that the jury did not need the aid of expert evaluation.

■ The admission or exclusion of expert opinion testimony is a matter within the sound discretion of the trial court, *Fair Mercantile Co. v. St. Paul Fire & Marine Ins. Co.*, 237 Mo.App. 511, 175 S.W.2d 930 (1943), and its admission is not objectionable for the reason, without more, that it "invades the province" of the jury or that it pertained to the "very issue" the jury was to decide.

Appellant next asserts that the trial court erred in not granting a new trial because in his opening statement plaintiff's attorney "said he would prove a number of matters which he did not later prove," and in this manner he "improperly planted certain ideas in the minds of the jury which were very prejudicial to [appellant] but which were not supported by evidence." Appellant does not set forth in his point the matters about which he complains.

■ The purpose of an opening statement is to inform the judge and jury in a general way of the nature of the case so as to enable them to understand and appreciate the significance of the evidence as it is presented. *Hays v. Missouri Pacific Railroad Company*, 304 S.W.2d 800 (Mo.1957). It is recognized that in the trial of a case the proof frequently fails to come up to expectations, and counsel necessarily must be allowed a reasonable latitude in stating to the jury the facts proposed to be proved. Therefore in the absence of grievous error, the good faith reference by counsel in the opening statement to matters subsequently not proved cannot constitute the basis for the reversal of a judgment. 75 Am.Jur.2d Trial § 209. See also the annotation pertaining to criminal cases in 28 A.L.R.2d at p. 972.

By turning to the argument portion of appellant's brief we there find reference to eight statements by plaintiffs' counsel which appellant asserts in his point "im-

properly implanted certain ideas in the minds of the jury which were prejudicial" to him. However, when we turn to the motion for new trial we find that mention was made of only three of the eight incidents referred to in argument.

We find no specific contention of bad faith on the part of plaintiffs' counsel, and we note that by Instruction No. 1 the Court advised the jury that they should "determine the facts * * * from the evidence," and that "Opening statements * * are not evidence." See *Thompson v. Bi-State Transit Systems, Inc.*, 458 S.W.2d 903 (Mo.App.1970). We also note, as stated in *Martin v. Hotel Kansas Citian, Inc.*, 516 S.W.2d 815, 817 (Mo.App.1974), that "If there was prejudicial error [resulting from the opening statement], it was more readily correctable at [the close of all the evidence] by requesting the court to instruct the jury to disregard the matter * * * or a request of the court for a withdrawal instruction." No request for such relief was made in this case. At the time the opening statement is made the court usually does not know what evidence is available, and therefore it must rely to a substantial degree on the good faith of counsel. *Kick v. Franklin*, 345 Mo. 752, 137 S.W.2d 512 (1939). With the above general principles in mind we shall examine the three incidents preserved for appellate review.

■ The first complaint is that plaintiffs' counsel stated that after the death of Daniel, Mrs. McKinley asked Dr. Ecker why Daniel had died, and that Dr. Ecker became agitated and excited and told her he was not going to help her against any other doctor. On rebuttal Mrs. McKinley testified that she tried to call Dr. Ecker to see if he "might help [her] find out what went wrong" and "he hung up the phone." Dr. Ecker did not testify, but appellant read into evidence portions of his deposition. Plaintiffs point out that Dr. Ecker gave a deposition "highly favorable" to appellant and that in answer to interrogatories Dr. Ecker was listed as a witness appellant expected to call. For that reason plaintiffs expected to be able to cross-examine him.

In our opinion no prejudicial error resulted even though we do not rely on this explanation of respondent, but it fortifies the conclusion that there was no bad faith on the part of plaintiffs.

The remaining two complaints pertain to the statements concerning the proposed evidence as to the use of Innovar. Plaintiffs' counsel stated that the evidence would show that the manufacturer of Innovar advised that it should not be used for people who had asthma, and also that the Innovar made Daniel's body rigid so that a large dose of Anectine was given. At the time of the opening statement the anesthetist was a defendant in the case, but during trial a settlement was made with her. These two items of evidence pertained primarily to plaintiffs' claim against the anesthetist. After the settlement plaintiffs had no need to present additional evidence on that claim. This does not demonstrate bad faith, and no prejudicial error resulted.

Appellant next asserts that trial court erred in "admitting * * * during rebuttal evidence that the autopsy performed on Daniel McKinley was not consented to by plaintiffs." He asserts the evidence was "irrelevant and prejudicial, did not rebut any evidence adduced by [appellant], and was designed to suggest some sort of conspiracy to conceal the cause of [Daniel's] death and arouse antagonism against [appellant] on the part of the jury."

■ We find no assignment of error in the motion for new trial pertaining to the alleged improper evidence "that the autopsy * * was not consented to by plaintiffs." The issue is not presented for appellate review. Rule 78.07; *Bremer v. Mohr*, 478 S.W.2d 14, 19 (Mo.App.1972).

Appellant next contends it was prejudicial to permit Mrs. McKinley to testify on rebuttal that Dr. Ecker hung up the telephone on her when she called him after Daniel had died.

■ Mrs. McKinley first testified on rebuttal that she had heard the deposition of Dr. Ecker read to the jury. She then testified without objection that she had "called

him and called his office, but he wouldn't talk to me." She was then asked: "Now, what was your purpose in calling him at that time?" Appellant objected because "it would be self-serving," and also because "the witness said this doctor is available for subpoena by plaintiffs' attorney." Appellant's counsel then added that there "was nothing developed in the deposition of Dr. Ecker * * * which would in any way indicate a problem about Mrs. McKinley trying to reach him and not reaching him. I don't think it is proper redirect [rebuttal?]. I think it is prejudicial and I think it is self-serving and it calls for hearsay and for these reasons I object." The court stated: "Mr. Lee let me overrule the objection as to the question just before the witness at this time, consider the ruling only goes to this question." The witness answered, "I thought he might help me find out what went wrong." There then followed three additional questions without any objection, and then this question was asked: "Now, I cannot ask you what Dr. Ecker said on this occasion, but would you tell me what Dr. Ecker did when you had him on the telephone on this occasion?" The answer was, "He hung up the phone." No objection was made to the question and there was no motion to strike the answer. The issues of whether this was proper rebuttal and the propriety of the question were not preserved for appellate review.

Appellant next asserts that the trial court erred in "allowing plaintiffs' counsel during closing argument [1] to suggest that a conspiracy existed among all of the parties who had been defendants * * * joined in by Dr. Gantner [the Chief Medical Officer for St. Louis County], * * * for which argument there was no foundation in evidence, and, in particular, [2] in allowing counsel to talk about the coroner system in Jefferson County as opposed to the office of Medical Examiner in St. Louis County, a matter entirely outside the record, because such argument was improper and highly prejudicial."

■ We have carefully read the argument by plaintiffs' counsel, and we consider

that part of the argument, which appellant asserts constituted a suggestion that a conspiracy existed among all the defendants, amounted to no more than fair comment on the evidence. In argument counsel is entitled to draw reasonable inferences from the evidence. However, appellant made no objection to the court on the basis now urged as error in that part of his point which we have designated as [1]. If there were merit to his contention, but we believe there is not, it could not constitute prejudicial error.

As to that part of this point which we have designated as [2], plaintiffs' counsel first described what was done by Dr. Gantner, and then improperly, in our opinion, commented as follows: "Now, what do you think a coroner would do in Jefferson County, who is not a doctor—" Appellant objected "to what would be done in Jefferson County," and plaintiffs' counsel said "I withdraw the argument." There was no request for further relief. Under these circumstances we find no prejudicial error. See *Hilton v. Thompson*, 360 Mo. 177, 227 S.W.2d 675 (1950).

Appellant next challenges Instruction No. 3, the verdict directing instruction. It was not contained in MAI but, in the parts here material, was patterned after MAI 20.02 (Wrongful death multiple acts submitted), MAI 21.01 (Malpractice), and MAI 19.01 (Submission as to one of several joint tort-feasors). Appellant does not contend an MAI instruction was available for use without modification. Appellant makes three challenges to this instruction which are, in our opinion, without merit. The three contentions of error were not the subject of a specific objection at trial, and none is mentioned in the motion for new trial. Therefore, the contentions of error are not preserved for appellate review. Rule 78.07; *Dyer v. Globe-Democrat Publishing Co.*, 378 S.W.2d 570, 579 (Mo.1964); *Bremer v. Mohr, supra.*

Instruction No. 5 followed MAI 5.03, but appellant asserts that as worded it was prejudicially erroneous and required a modification because, as he states, it provided that "In assessing damages you may take

into consideration any aggravating circumstances attendant upon the fatal injury," and that this permitted the jury to consider aggravating circumstances totally unrelated to any negligence of appellant.

At the time the instruction was given, appellant objected because it "includes the provision with respect to aggravated circumstances," but there was no objection for the specific reason now advanced on this appeal. Instruction No. 5 was the subject of an assignment of error in the motion for new trial, but the specific objections there made were "there was no substantial or credible evidence sufficient to permit the jury to consider such matters," and it "needlessly and improperly invited speculation and conjecture and induced the jury to return a verdict for an amount which was grossly excessive and beyond any reasonable concept for pecuniary loss for which such recovery is limited in law." The specific objection now advanced on this appeal was never presented to the trial court, and is not preserved for appellate review. Rule 78.07; *Moll v. Springdale Park, Inc.*, 395 S.W.2d 126 (Mo.1965). Appellant may not interpose one objection to the trial court and another on appeal. *Negley B. Calvin Inc. v. Cornet*, 427 S.W.2d 741, 746 (Mo.App.1968). In addition, this was a measure of damages instruction; not a verdict directing instruction. As stated in *Barber v. M.F.A. Milling Co.*, 536 S.W.2d 208, 210 (Mo.App.1976), "if defendant feared the measure of damage instruction was susceptible to misunderstanding because of its general scope, it was incumbent upon the defendant to submit an explanatory or modifying instruction before it can be heard to complain." See also, *Miller v. Ranson and Company*, 407 S.W.2d 48 (Mo.App. 1966); *Hough v. Jay-Dee Realty and Investment Inc.*, 401 S.W.2d 545 (Mo.App. 1966); *Samuels v. Illinois Fire Insurance Company*, 354 S.W.2d 352 (Mo.App.1961).

Appellant also asserts that the jury verdict was "grossly excessive." At the time of Daniel's death the maximum recoverable in an action for wrongful death was $50,-000. § 537.090 Laws of Missouri 1967, p.

664 (now amended, Laws of Missouri 1973, p. 498). The jury determined that plaintiffs' total damages were $50,000, but pursuant to instructions of the court the jury subtracted therefrom $22,000, the amount paid to plaintiffs by the two other defendants in settlement of the claims against them, and rendered a verdict against appellant for the remainder, or $28,000.

Appellant argues that "damages for pecuniary loss on account of the death of a child are permitted only to age twenty-one," and that "it was impossible for the jury to make any finding of significant pecuniary loss to the plaintiffs beyond the evidence of their expenses for [Daniel's] funeral and grave marker."

When a verdict is claimed to be excessive and is not supported by evidence, the only reasonable hypothesis is that there was prejudice on the part of the jury or that the jury willfully disregarded the instructions. The assessment of damages is peculiarly the function of a jury and a verdict should not be interfered with absent an exercise of extreme caution because an appellate court does not pass on the weight of the evidence in a jury case, and for that reason an appellate court will not determine the existence of bias and prejudice of the jury on the amount of the verdict alone. Each case must be considered on its own facts, and consideration is given to the nature and extent of the changing economic factors, and the compensation awarded and approved in comparable cases. Consideration is also to be given to the fact that the jury and trial judge were in a better position than the review appellate court to measure an award for reasonable compensation, and that the trial court has approved the verdict in issue. *Mudd v. Quinn,* 462 S.W.2d 757, 761 (Mo.1971); *Smyth v. Hertz Driv-Ur-Self Stations,* 93 S.W.2d 56 (Mo. App.1936).

A detailed statement of Daniel's financial contribution to the family unit is not necessary. It is sufficient to say that he was 18 years of age, in good health except for the asthma condition, that he had been employed, he was a member of a closely united family, and that his father was retired from employment because of a physical disability. Also the jury was not instructed that it could not consider possible financial aid by this son to his parents after he reached age 21, and the Supreme Court of this State in *Mitchell v. Buchheit,* 559 S.W.2d 528 (1977) ruled that "Parents, seeking to recover for the death of a minor child, should not be prohibited from trying to establish a reasonable probability of pecuniary benefit from the continued life of said child beyond the age of minority." The award in this case is not out of line with compensation awarded and approved in comparable cases. See *Mudd v. Quinn, supra; Tripp v. Choate,* 415 S.W.2d 808 (Mo.1967); and *Hartz v. Heimos,* 352 S.W.2d 596 (Mo.1962). Appellant has not persuaded us that the verdict should be disturbed.

Appellant's final point deserves only passing comment. It is that the "cumulative effect of the errors" deprived him of a fair trial. We have found no prejudicial error resulting from the incidents we have reviewed on the merits. Other contentions were not preserved for appellate review. The "cumulative effect" of these cannot result in the denial of a fair trial.

The judgment is affirmed.

SIMEONE, C. J., and NORWIN D. HOUSER, Special Judge, concur.